[Crim. No. 5485. Third Dist. Oct. 5, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
EXCEL WILLIAMS, Defendant and Appellant.

972

---

**Counsel**

Clyde M. Blackmon, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Elliott D. McCarty, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PIERCE, P. J.**—This appeal is from a conviction of one count of violation of Penal Code section 470 (forgery) with an admitted prior for burglary (second degree).

There are three assignments of error: (1) misapplication of the "multiple admissibility" rule;[1] (2) misuse of photographic evidence as an aid of identification; and (3) inadequacy of trial counsel. Our overall appraisal after examining the record has convinced us that although contentions (1) and (3) have some substance and that error occurred, it was not prejudicial, and we will affirm the judgment. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

### FACTS

On February 15, 1969, two Negro males presented themselves at a checkout stand in Van's Food Market in Sacramento, and one of them offered to pay for a grocery purchase with a check printed as one of a series purporting to be issued by California-Western States Life Insurance Company under circumstances described in the margin.[2]

The check presented was in the amount of $89.50, bore the purported written signature "Michael L. Sanders," as a signing agent for the insurance company (there being no such official), and "Herman Carter," as payee (there having been no such disability claimant). The check was already endorsed when presented. Under the endorsement was a fictitious address.

Checkout clerk William Brennan called head clerk Robert Gallegos over to approve the check. Gallegos assumed from the position of the men at the checkstand that one wearing a dirty tan overcoat had presented the check and that the other was his companion. Gallegos asked for a driver's license and was informed that the "customer" did not have one; a hunting or fishing license was then offered as identification. Gallegos' suspicions aroused, he retained the check and left to phone the Retail Credit Association.

---

[1]The name of the rule is derived from the caption in 1 Wigmore, Evidence (3d ed.) § 13, p. 299. The rule is defined as follows: "It constantly happens that a fact which is *inadmissible for one purpose is admissible for other purposes*. . . ."

[2]In 1967, 87,000 sight drafts (referred to by the parties and hereinafter as "checks") printed for use in payment of disability claims were ordered by California-Western States Life Insurance Company and placed in storage. A misprint was discovered making them worthless. It was the intent of the company to cut them in half with a large-size paper cutter and deliver them in separate bundles to Independent Paper Company which by contract with the insurance company received the latter's waste paper. Through some mishap a large supply of these printed checks reached the paper company without mutilation.

By the time Gallegos returned to the checkout stand the two men had left the store, driving away in a Cadillac, stipulated at the trial to be registered to Williams' wife. The Cadillac was described by one witness as "maroon," by another as "rose pink."

Gallegos was the only prosecution witness to identify Williams as perpetrator of the check passing attempt at Van's Food Market. Brennan, the clerk who had been present during the entire episode, Cleman, the store detective (not a witness), Annigoni, the store manager,[3] and Gilbertson (the latter not called as a witness) did not identify Williams. Gallegos made an in-court identification. This was preceded by a photographic mug-shot "identification" which we will discuss under a separate caption below.

Donnetta Armstrong was a prosecution witness. At the time of trial she was serving a 30-day sentence in Sacramento County jail for petty theft (on a charge reduced from forgery). She testified to the following sequence of events involving defendant Excel Williams: She had met him in December 1966 at the home of one Darlene Young. There Williams had shown her a stack of checks an inch thick, all of which were, as other prosecution testimony proved, a part of the misprinted 87,000 checks referred to above. Williams told Miss Armstrong that he had received the checks from a friend who worked for the paper company.

At the first meeting between Williams and Miss Armstrong, the former after exhibiting the stack of checks persuaded her and Miss Young with several other (unnamed) women to embark upon a career of bad-check-passing ("paper hanging") under Williams' direction. Williams was to furnish the supply of checks and was to receive half the "take." Under this plan Williams was to remain in the background. The girls were to write in the fictitious signatures of the makers, write in their own (and sometimes possibly fictitious) names as disability payees and fill in the denominations—then pass the checks. (At that first meeting some of the checks were thus made out.) Miss Armstrong started out with four checks on California-Western States Life forms. She unsuccessfully attempted to cash them at two stores.

Later Williams, according to Miss Armstrong's testimony, had given 13 checks to her. There were checks with S & T Produce Co. of Galt printed as the maker. Apparently it was when Miss Armstrong attempted to pass one

[3]During the attempt described Larry Annigoni had happened to be seated outside in his car talking with the assistant manager, Gilbertson. The two took after the Cadillac as it drove off and followed it for two miles. (It was not a chase. Annigoni did not intend to arrest the car's occupants. The latter in turn apparently did not realize they were being followed since they took no evasive action.) During the ride both Annigoni and Gilbertson noted the Cadillac's license number and also drew up alongside the car for the purpose of trying to establish the identity of its occupants. Neither did. That episode, however, was after dark.

of these checks that she was apprehended. All of the foregoing testimony by Miss Armstrong was admitted into evidence without objection.

William Robinson was a prosecution witness. He testified he had known Williams for seven or eight years. Robinson had been employed by Independent Paper Company for six years. He recounted a conversation with Williams in December 1968. Williams, according to Robinson, had driven up to the plant while Robinson was eating his lunch. Williams asked for another acquaintance, MacDaniels, who had worked for the paper company but was not so employed at that time. Williams then asked Robinson if he could get him any blank checks. Robinson replied: "He [Williams] gave me his phone number and that was it. I don't remember the extent of the conversation. I may have told him I wasn't interested or something."

Williams' defense was that of mistaken identity. Specifically it was based upon a contention that a man closely resembling him had been on a bad-check-cashing spree in Sacramento on February 14 and 15.[4]

Williams did not take the stand in his own defense. He produced three of the victims involved in the counts which had been dismissed. (See fn. 4.) He also produced a handwriting expert and Williams' wife, Mary. The relevancy of the latter's testimony was her statement that she had never seen her husband in a tan coat, that she, herself, did not drive her car, and that Williams who did drive it often loaned it to others. The three check victims called by Williams were Wilbert Lee, Melvin F. Foster and Earl Moors. Each check passed had been, like the one presented at Van's Food Market, one of the insurance company's misprinted forms, each was made payable to "Herman Carter" and bore as the maker's signature "Michael Sanders." Unlike the check involved in the count ultimately charged, however, at least one had been endorsed in the presence of the person victimized.

Lee was a clerk at E-Z Mart. The check passed there was presented by a male Negro. It was endorsed "Herman Carter" in Lee's presence with the same (fictitious) address, "6649—27th St.," written below the name. The man wore a dirty tan overcoat. Lee could not identify Williams as the man who had passed the check.

Defense witness Foster of Tallac Bottle Shop also had cashed a check for a male Negro. He could not remember whether the check had been endorsed in his presence. That was his practice, a rule that had been sometimes broken. He could not identify Williams as the passer of the check.

---

[4]In this connection we note that originally the complaint filed in the municipal court had charged Williams with seven counts, the first information charging him had contained five counts, all of which excepting count 1—the attempt at Van's Food Market—had been dropped.

Earl Moors was the proprietor of a family-run shoe store. Two male Negroes had entered the store, one selected a pair of shoes, then presented a check as described. Unlike the other victims, Lee and Foster, he did identify Williams as the check passer. He also testified, "God forgive me if I am wrong. I certainly think he is the man." He also believed that the person had endorsed the check in his presence. He had been writing out the bill for the shoes at the time and testified: "I didn't look to see if there was ink flowing out of the pen, you know what I mean." Regarding the identification offered, a driver's license, he noted particularly that the address thereon was different from the address written on the check. The man told him he had moved. From the fact the "change" of address was noted it is inferable that the license was issued to Herman Carter. It is also inferable that the photograph on the license bore some resemblance to the person passing the check.

Defense witness John Jorgensen was a handwriting expert with 25 years' experience. He was employed by the State Bureau of Identification. He had examined ALL of the checks passed or attempted to be passed (including that involved in the Van's Food Market incident, People's Exhibit 1) and had compared these with exemplars of Williams' handwriting. The examination had been made at the request of the Sacramento Police Department before the charges, excepting count 1, had been dropped. His opinion as a result of these examinations was: (1) that none of the checks had been endorsed by Williams; (2) that a different person had endorsed People's Exhibit 1 than the person who had endorsed the others; (3) that Williams had not written any of the purported maker's signatures, "Michael L. Sanders," or the payee's name, "Herman Carter." The four checks offered in evidence in this case, one by the prosecution and three by the defense, had been four of ten given to him for a handwriting comparison by the police department.[5]

### EVIDENCE OF OTHER CRIMES: THE TESTIMONY OF DONNETTA ARMSTRONG

The general rules as to when evidence of other crimes may and when it may not be received in evidence and the reasons for those rules have been frequently enumerated by our appellate courts and Supreme Court.

■ Fundamentally involved, of course, is the rule of relevancy (applicable to all evidence): "whether it tends logically, naturally, and by

---

[5]We have explained the foregoing evidence (and hereinafter will describe that relating to the photographic identification) in greater detail than ordinarily would be necessary. Our reason is that when error has occurred and decision rests upon the existence or nonexistence of a miscarriage of justice it is the duty of a reviewing court to reweigh the evidence rather than rely on the substantial evidence rule. (*Aldabe* v. *Aldabe* (1962) 209 Cal.App.2d 453, 457 [26 Cal.Rptr. 208] (hg. den.).)

reasonable inference, to establish any fact material for the People. . . ." (*People* v. *Kelley* (1967) 66 Cal.2d 232, 239 [57 Cal.Rptr. 363, 424 P.2d 947], paraphrasing *People* v. *Peete* (1946) 28 Cal.2d 306, 314-315 [169 P.2d 924]—quoted in *People* v. *Durham* (1969) 70 Cal.2d 171, 186-187 [74 Cal.Rptr. 262, 449 P.2d 198]; see also *People* v. *Schader* (1969) 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841]; *People* v. *Haston* (1968) 69 Cal.2d 233, 244-245 [70 Cal.Rptr. 419, 444 P.2d 91].) All of these cases recognize that the fact that commission of another crime by defendant proves him to be criminally disposed is not an admissible incidence of relevancy and "[s]uch evidence should be scrutinized with great care." (*Durham, supra,* at p. 186.) The reason for caution is that admission of such evidence has inherently great prejudicial effect. (*Id.,* p. 186.)

This court stated in *People* v. *Adamson* (1964) 225 Cal.App.2d 74, 76 [36 Cal.Rptr. 894] (hg. den.): "Under the foregoing rule evidence is admitted of similar acts which tend to show either guilty knowledge, intent (or motive) or design. (*People* v. *Coefield,* 37 Cal.2d 865, 870 [236 P.2d 570].)"

■ It is to be noted, as it so often must be where the admissibility of evidence having conflicting probative versus prejudicial aspects is involved, that there is a weighing process which takes place. And as is so often the case in that event the problem is primarily one for the trial court in the exercise of a sound discretion. This has special application when the evidence has relevancy to prove identity. (*People* v. *Haston, supra,* 69 Cal.2d, p. 245.) But always that court's discretion must be exercised "within the context of the fundamental rule that relevant evidence whose probative value is outweighed by its prejudicial effect should not be admitted." (*Id.,* p. 246.)

In *People* v. *Albertson* (1944) 23 Cal.2d 550 [145 P.2d 7], the court explains thoroughly (on pp. 576-578) the reasons for the cautious receipt of evidence of proof of other crimes. It quotes liberally (on p. 577) from Wharton's Criminal Evidence, section 360, page 567, including this passage: " '. . . It does not reflect in any degree upon the intelligence, integrity, or the honesty of purpose of the juror that matters of a prejudicial character find a permanent lodgment in his mind, which will, inadvertently and unconsciously, enter into and affect his verdict. The juror does not possess that trained and disciplined mind which enables him either closely or judicially to discriminate between that which he is permitted to consider and that which he is not. Because of this lack of training, he is unable to draw conclusions entirely uninfluenced by the irrelevant prejudicial mat-

ters within his knowledge. . . .' " (This court used the same excerpt in *People* v. *Adamson, supra,* 225 Cal.App.2d 74, at p. 77.)

■ We think that statement deserves special emphasis when we consider the question whether it is the duty of the trial court to instruct the jury *sua sponte* that evidence of other crimes is admissible only for a limited purpose, explaining that limitation and cautioning against a misuse of such evidence. Citing *People* v. *White* (1958) 50 Cal.2d 428, 430 [325 P.2d 985] (a case involving admissibility of evidence for impeachment purposes) a number of appellate courts have stated inflexibly that "the rule is well settled" that a defendant waives his right to an instruction on the limited purpose of receipt of evidence of prior unlawful acts by failing to request such an instruction. (See e.g., *People* v. *Miller* (1966) 245 Cal.App.2d 112, 152 [53 Cal.Rptr. 720]; *People* v. *Marshall* (1964) 226 Cal.App.2d 243, 245 [37 Cal.Rptr. 887]; *People* v. *Shannon* (1963) 211 Cal.App.2d 525, 531 [27 Cal.Rptr. 264]; see also *People* v. *Holbrook* (1955) 45 Cal.2d 228, 233 [288 P.2d 1]; but see per contra *People* v. *Demes* (1963) 220 Cal.App.2d 423, 439 [33 Cal.Rptr. 896], which states "it was incumbent on the court" to give a limiting instruction.) With that quoted statement we agree. This court finds unchallengeable the statement of Mr. Wharton which we have quoted above. And if the trial court must *exercise caution* in submitting evidence of other crimes to jurors *at all* because they are unskilled and undisciplined in perceiving the limited purpose for which such evidence may properly be considered, then it seems to this court that a trial court in the interest of fairness at least owes *the duty of explaining that need of caution* to the jury.

■ In the light of these rules we consider the evidence of Miss Armstrong admitted into evidence without objection. When that evidence was offered the prosecution had already proved the commission of the crime of forgery—an attempt at Van's Food Market to pass a forged disability claim's draft. Williams had been identified as the wearer of a dirty tan overcoat who had been the guilty person and who had escaped in a red (or pink) Cadillac automobile registered to Williams' wife. The check had been produced in evidence. It was a California-Western States Life form of a special kind. The offer of the testimony of Miss Armstrong as a witness to prove that the accused, Excel Williams, had had possession of a large supply of such forms and that he intended their use for purposes of forgery was relevant and highly incriminating. To the extent that introduction of the Armstrong testimony was limited to use for that purpose, we hold that the trial court did not exceed its discretion. But the prosecutor went much farther than that, and the trial court permitted him to do so. Miss Armstrong's story went on to prove not only the foregoing facts but that defendant Williams was a nonfictional Fagin who had organized

and operated a team of bad check passers using not only the life insurance company misprinted checks referred to but 13 others in which S & T Produce Co. was the purported maker—and that was not the offense for which Williams was on trial. Much of such evidence was relevant only to prove that Williams was a very criminal character.

■ Inadmissible evidence unobjected to at the trial is not subject to review on appeal. Ordinarily failure to make proper objection waives the defect. (See Witkin, Cal. Evidence (2d ed. 1966) § 1285, p. 1188, and cases cited.) But "[w]here the failure to object to significant inadmissible evidence in a criminal trial is due to the inexcusable ignorance or incapacity of the defendant's attorney, the judgment may be reversed for incompetency of counsel." (*Id.*, § 1308, p 1210.) ■ Counsel is deemed incompetent when his inadequacy reduces the trial to a farce or a sham or deprives defendant of a crucial defense. (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 466 [34 Cal.Rptr. 863, 386 P.2d 487].) ■ An indigent defendant in a criminal case has a right to assigned counsel in every case, including misdemeanors, and no showing of prejudice is required when that right is denied him. The conviction must be reversed. (*In re Smiley*, 66 Cal.2d 606 [58 Cal.Rptr. 579, 227 P.2d 179].) But that decision states on page 626: "A defendant who has been afforded the assistance of counsel must bear a heavy burden if he contends that assistance was in fact worthless, and one of the few ways in which he can succeed is to establish that through a mistake of law or fact his counsel withdrew a crucial defense from the case [citing *Ibarra*]. [T]here is a presumption, born of necessity and experience, that under our adversary system of justice an attorney will strive to defend his client's interests to the best of his professional ability."

■ We deem that neither trial defense counsel's failure to object to that portion of Miss Armstrong's testimony which we regard as inadmissible, his failure to offer a limiting instruction to be given to the jury, or the court's failure to give such an instruction *sua sponte* was prejudicial.

Williams was deprived of no crucial defense; he had no defense that any reasonable jury could believe. *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], states at page 836, "[t]hat a 'miscarriage of justice' [under article VI, section 13, of the California Constitution] should be declared only when the court, 'after an examination of the entire cause, including the evidence' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."[6]

---

[6]We have assumed that none of the error we have found was of United States constitutional dimensions and therefore that the *Watson* test applies. But our conclusions

To reiterate the evidence we have already painstakingly outlined is unnecessary. Williams' defense that the crime was committed by someone who looked like him does not explain the escape in a Cadillac registered to his wife. It does not explain his search for a supply of misprinted checks from an employee of Independent Paper Company. It does not explain Williams' possession of a large batch of such misprinted life insurance company checks which had been consigned to that paper company—possession with an intent that they be used for forgery.

Moreover, Williams' misidentification defense boomeranged. Defense witness Moors was one of the most effective witnesses against him. Moors was undoubtedly mistaken in believing that Williams had actually endorsed the forged check cashed by Moors in the latter's presence, but the victim was positive in his identification of Williams and the check was from the same batch and similar in every detail to that attempted to be passed at Van's Food Market.

### Photographic Identification

Williams contends that five mug shots used by the police and presented to Gallegos as an aid to the identification of Williams were unfairly so used. These photographs were presented to Gallegos at Van's Food Market some days after the crime. Williams was then already in custody. From the pictures presented Gallegos selected that of Williams as the person who had presented the check.

It has been stated in criticizing this type of police evidence that "use of the technique may result in convictions based on misidentification [although this] may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967].) Simmons permitted the offered proof under the facts there present, saying that "each case must be considered on its own facts," but added that such identification should be set aside if the procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (P. 384 [19 L.Ed.2d at p. 1253].) This court found tainted as rigged and "impermissibly suggestive" the photographs used in *People* v. *Pedercine* (1967) 256 Cal.App. 2d 328, 334-336 [63 Cal.Rptr. 873]. Those used in the instant case, on the other hand, we find to have been most fairly selected and used—after

would not differ if such constitutional error exists. The prosecution, notwithstanding the error, had by its evidence convinced us it was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824]; *People* v. *Gallardo* (1969) 269 Cal.App.2d 86, 89 [74 Cal.Rptr. 572].)

we had actually discovered which one was the picture of Excel Williams.[7] One other of the five photographs so closely resembles the actual picture of Williams it is difficult to tell the men apart and two others are quite similar. Thus, of the five photographs shown only one—not of Williams—was a "misfit." Gallegos, testifying, stated that there was no actual resemblance whatever between any two of the persons shown in the photographs. As we have indicated above, from our own observation of the pictures we disagree with that statement. The witness also testified that when he examined the photographs he was doubtful as to his identification. He was certain of his identification, however, when he saw Williams at the preliminary hearing; certain again when he made his in-court identification. The jury saw the photographs. It saw Williams at the trial. The contention that this identification was tainted cannot be sustained.

Judgement is affirmed.

Friedman, J., and Janes, J., concurred.

A petition for a rehearing was denied October 30, 1970.

---

[7]At the trial the five photographs were marked. The one which had been selected by Gallegos as being that of defendant was then pointed out, shown to the jury and shown to the court. It was stated in the record to be a photograph of Excel Williams. Which of the five photographs it was that had been so selected was never separately marked for identification. All five photos were admitted in evidence. We have only been able to identify Williams' picture by references to the date shown on the photograph and thereafter referred to in argument.