[Crim. No. 30435. Second Dist., Div. Two. Dec. 7, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
STANLEY PAUL KELLEY, Defendant and Appellant.

674

COUNSEL

Paul Arthur Turner, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Steven H. Zeigen, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

FLEMING, Acting P. J.—Appellant is one of three defendants originally charged in a twenty-two-count information, from which twelve counts were severed for the instant trial: nine counts of armed robbery with use of a firearm, one count of kidnapping for purposes of robbery with use of a firearm, one count of armed burglary with use of a firearm, and one count of first degree murder. After a jury trial in excess of four weeks, the jury found appellant guilty of three counts of armed robbery with use of a firearm and disagreed on the other nine counts, as to which the court declared a mistrial. The court denied appellant's motion for new trial and sentenced him to state prison for terms to be served concurrently.

On this appeal appellant contends: (1) the trial court should have excluded evidence of an uncharged offense, namely, the theft of a two-tone brown Cadillac Seville used in some of the robberies, and in any event it should have given *sua sponte* an instruction limiting the applicability of evidence of the Cadillac's theft; (2) the court should have given appellant's requested *Guzman* instructions concerning eyewitness identification (*People* v. *Guzman* (1975) 47 Cal.App.3d 380 [121 Cal.Rptr. 69]); (3) the repeated misconduct of the deputy district attorney prejudicially influenced his case.

Before discussing the facts and contentions in detail, it is helpful to put the issues in perspective. The evidence against appellant on almost all counts was strong, and in fact it is surprising the jury disagreed on them. Defendants, while driving the stolen Cadillac, were involved over a two-day period in a series of armed robberies, many of whose victims identified some or all defendants credibly. Much of the stolen property was recovered in codefendant Miller's apartment or personal possession, and appellant was arrested in the stolen Cadillac. On such a record only extremely serious error at trial could be deemed prejudicial, and for this reason, among others, most of appellant's contentions are not significant. However, the conduct of the deputy district attorney raises a serious question whether the trial itself, characterized by the trial judge as an unprofessional "Pier 6 brawl," deteriorated into farce and sham.

### Facts

The charged offenses, occurring on 21 and 22 February 1976, involved (1) the armed robbery of Hicks; (2) the armed robberies of Menefee and Powell; (3) robbery and burglary of the Club Mugen; (4) armed robbery

of Huey, who was locked in the trunk of his car following the robbery; (5) armed robbery of Alvin Tate and murder of Jimmie Grisby. The jury convicted appellant of the Menefee/Powell robberies and the Huey robbery.

The Hicks incident allegedly occurred about 1 a.m. on 21 February 1976. Hicks had dropped off his girlfriend at her Culver City home and was beginning to drive away when a Cadillac Seville, which he described as black over silver, pulled abreast of him. Two individuals got out of the Cadillac and approached Hicks; one, defendant Miller, had a gun. Hicks unlocked the car door, and Miller took his digital watch, rings, and cash, and tore the telephone out of the automobile. One robber threw Hicks' car keys into the bushes. After the robbers departed, Hicks reported the robbery to the police but lied about the place of its occurrence to prevent his wife discovering he had been out with a girlfriend. Hicks' watch and some of his rings were later recovered from Miller on the latter's arrest. Hicks' identification of Miller was shaky. He testified that he only glanced at him a couple of times. The jury hung on this charge.

Next came the Menefee/Powell robberies, about 9 or 10 p.m. on February 21. While Powell, a retired police officer, and Menefee were sitting in a parked car in the View Park area, three individuals approached the car from both sides, and one put a gun to Powell's head. Appellant told Menefee "Don't turn around. I'll blow your head off." While appellant took a watch, ring, and about $175 from Menefee, defendants Miller and Robinson were robbing Powell. After the robberies, two of the three robbers were observed fleeing toward a two-toned brown Cadillac. An eyewitness, Yolanda Lewis, identified appellant as one of the robbers and described the Cadillac Seville. Powell identified Robinson and Miller, and Menefee identified appellant. As stated, the jury convicted on the charges arising out of this incident.

The Club Mugen incident occurred about 10:15 p.m. on February 21, the same evening as the Menefee/Powell incident. Various witnesses testified that four armed individuals entered the club (a restaurant and bar on Crenshaw) from the rear exit, held up the patrons, and cleaned out the cash register. The club proprietor and an eyewitness, Ed Sanders, identified Miller and Robinson at a lineup, and the bartender, Reva Caliman, identified all defendants. Mrs. Sanders also identified Miller and appellant. A credit card stolen from one of the patrons, Freddie

Chavez, later turned up in the brown Cadillac Seville in which appellant was ultimately arrested. The jury hung on the Club Mugen charges.

The Huey incident and the Tate/Grisby incident both occurred around 2 to 3 a.m. on February 22 in the parking lot across from a club called the 2001 Disco near Eighth and La Brea. Huey testified that as he was leaving the club and walking to his car he saw the three defendants get out of a brown Cadillac Seville, appellant and Miller being armed with guns. Huey later identified appellant from a photo lineup. Miller ordered Huey out of the car and took his money and jewelry. The three then locked Huey in the trunk of his car. His ring was later found in Miller's possession at the time of Miller's arrest. The Huey charges resulted in conviction.

The Tate/Grisby incident, which did not result in a conviction, occurred as Jimmie Grisby and his brother-in-law Alvin Tate were leaving the 2001 Club about 3 a.m. As they were getting into their automobile, appellant and Robinson approached with a gun and demanded money from Tate. While Robinson was searching Tate on the passenger side of the car, Tate observed two persons robbing Grisby on the driver's side. Someone told Grisby to "shut up,' and then Tate saw a shot fired. Grisby ran into the street, collapsed, and died. Tate identified appellant and Robinson, but he had changed his story several times between pretrial and trial.

Appellant was arrested in the two-tone brown Cadillac Seville. Over objection, evidence was introduced that the vehicle belonged to David Shapell and had been stolen from a Beverly Hills parking garage on 17 February 1976 prior to the time of the charged offenses. The vehicle when stolen had personalized license plates, DS 18. A friend of appellant's testified that at one point she rode with appellant in the Cadillac and he told her the DS stood for "Diamond Stanley." The evidence also showed that on 20 February 1976 license plates 758 JMU had been removed from a Chrysler Imperial, and thereafter placed on the two-tone Cadillac Seville in which appellant was arrested on February 23. After the car was returned to its owner from the police impound, one of Shapell's employees found two .38 calibre bullets in it and two stolen credit cards, one of which belonged to a Club Mugen patron.

CONTENTS

1. *Admission in Evidence of Cadillac Theft and Lack of Limiting Instruction Thereon.*

■ It is hornbook law that evidence of uncharged offenses is inadmissible to prove criminal propensity to commit the crime charged, but that such evidence may be used to prove other matters if it is sufficiently relevant and not unduly prejudicial. (*People* v. *Sam* (1969) 71 Cal.2d 194, 203 [77 Cal.Rptr. 804, 454 P.2d 700]; *People* v. *Haston* (1968) 69 Cal.2d 233, 245 [70 Cal.Rptr. 419, 444 P.2d 91].) In such instances the trial court must weigh "probative value" against "danger of undue prejudice" (Evid. Code, § 352). On appeal the court's exercise of discretion will not be disturbed absent a clear showing of abuse. (*People* v. *Delgado* (1973) 32 Cal.App.3d 242, 251 [108 Cal.Rptr. 399], overruled on another point in *People* v. *Rist* (1976) 16 Cal.3d 211, 221-222 [127 Cal.Rptr. 457, 545 P.2d 833].)

■ At bench, use of the Cadillac Seville was part of the res gestae of the crime and relevant to the issue of identity. (Cf. *People* v. *Rodriguez* (1977) 68 Cal.App.3d 874, 883 [137 Cal.Rptr. 594].) Evidence of the stolen license plates was necessary to explain the changes in the automobile's plates between the time appellant was first observed in the vehicle and the time of his arrest. Evidence of the theft of the automobile was relevant to show that it came into defendants' possession before the time of the charged offenses. The quantity of evidence introduced on this issue was small and consumed little time. No attempt was made to prove the circumstances of the theft of the vehicle. The brief testimony concerning the theft could not have influenced the outcome of this case, given the length of the trial, the volume of eyewitness identification, and the multiplicity of similar charges. The trial court did not abuse its discretion in admitting this evidence.

Similarly, lack of a limiting instruction in such instances is reversible error only when prejudicial. (*People* v. *Harris* (1974) 39 Cal.App.3d 965, 971 [114 Cal.Rptr. 892]; *People* v. *Williams* (1970) 11 Cal.App.3d 970, 979 [90 Cal.Rptr. 292].) In *People* v. *Williams, supra,* defendant was being tried for forgery, and the trial court admitted extensive evidence "that defendant Williams was a nonfictional Fagin who had organized and operated a team of bad check passers," evidence which was "relevant only to prove that Williams was a very criminal character." (*Williams, supra,* at pp. 978-979.) Yet the court found that neither the

receipt of the evidence, nor the court's failure *sua sponte* to give a limiting instruction, was prejudicial. A fortiori, the same result obtains here.

## 2. *Failure to Give Guzman Instructions.*

■ *People* v. *Guzman* (1975) 47 Cal.App.3d 380, 386-387 [121 Cal.Rptr. 69], sets out a series of detailed instructions enumerating in detail the factors a jury must consider in evaluating eyewitness identification testimony. Although the court held it erroneous in that case not to give the instructions, it did not declare that such instructions should be required in every case. Rather it enunciated the general principle that "a defendant is entitled to an instruction directing the jury's attention to evidence from the consideration of which reasonable doubt of defendant's guilt might be engendered." (*Guzman, supra,* at p. 387.) At bench the court gave CALJIC instructions No. 2.20 and No. 2.91, set forth in the margin.[1] These instructions sufficiently focused the jury's attention on the People's burden of proof on the issue of identity. (*People* v. *Boothe* (1977) 65 Cal.App.3d 685, 690 [135 Cal.Rptr. 570]; *People* v. *Smith* (1977) 67 Cal.App.3d 45, 49 [136 Cal.Rptr. 387].) The trial court did not err in refusing to give the *Guzman* instructions.

---

[1]CALJIC No. 2.20: "Every person who testifies under oath is a witness. You are the sole and exclusive judges of the credibility of the witnesses who have testified in this case.

"In determining the credibility of a witness you may consider any matter that has a tendency in reason to prove or disprove the truthfulness of his testimony, including but not limited to the following:

"His demeanor while testifying and the manner in which he testifies;

"The character of his testimony;

"The extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies;

"The extent of his opportunity to perceive any matter about which he testifies;

"The existence or nonexistence of a bias, interest, or other motive;

"A statement previously made by him that is consistent with his testimony;

"A statement made by him that is inconsistent with any part of his testimony;

"The existence or nonexistence of any fact testified to by him;

"His attitude toward the action in which he testifies or toward the giving of testimony;

"His admission of untruthfulness."

CALJIC No. 2.91: "The burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of defendant as the person who committed the offense before you may convict him. If, from the circumstances of the identification, you have a reasonable doubt whether defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty."

### 3. *Instances of Misconduct by the Deputy District Attorney.*

■ As the representative of the government a public prosecutor is not only obligated to fight earnestly and vigorously to convict the guilty, but also to uphold the orderly administration of justice as a servant and representative of the law. Hence, a prosecutor's duty is more comprehensive than a simple obligation to press for conviction. As the court said in *Berger* v. *United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629]: "[The Prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." (See also, *United States* v. *Agurs* (1976) 427 U.S. 97, 110-111 [49 L.Ed.2d 342, 353-354, 96 S.Ct. 2392]; *Giglio* v. *United States* (1972) 405 U.S. 150, 153 [31 L.Ed.2d 104, 108, 92 S.Ct. 763]; *United States* v. *Ash* (1973) 413 U.S. 300, 320 [37 L.Ed.2d 619, 632-633, 93 S.Ct. 2568]; *United States* v. *Whitmore* (D.C. Cir. 1973) 480 F.2d 1154, 1158 [156 App.D.C. 262]; *People* v. *Bain* (1971) 5 Cal.3d 839, 849 [97 Cal.Rptr. 684, 489 P.2d 564]; *In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234]; *People* v. *Sheffield* (1930) 108 Cal.App. 721, 732 [293 P. 72]; *People* v. *Ruthford* (1975) 14 Cal.3d 399, 405-408 [121 Cal.Rptr. 261, 534 P.2d 1341]; *People* v. *Wagner* (1975) 13 Cal.3d 612, 619-620 [119 Cal.Rptr. 457, 532 P.2d 105]; *People* v. *Kiihoa* (1960) 53 Cal.2d 748, 753 [3 Cal.Rptr. 1, 349 P.2d 673]; *People* v. *Mendoza* (1974) 37 Cal.App.3d 717 [112 Cal.Rptr. 565].)

Set out below are instances in this case where the conduct of the deputy district attorney appears to have fallen short of those standards.

1. At the outset of the proceedings the deputy district attorney refused to sign a pretrial discovery compliance order, which signature is routinely required by superior court rules. Rather than risk a confrontation, the trial judge permitted her to allege discovery compliance orally.

2. During a preliminary motion the deputy district attorney told appellant's attorney, deputy public defender Nierenberg, "Excuse me, if you interrupt me again, I'm going to kick you in the ankle." The record does not indicate significant prior interruptions by Nierenberg. The court remonstrated and said to her, "I think you have been doing rather well on interrupting people."

3. At the point in Hicks' cross-examination when he admitted having lied about the place of the robbery, Meyers (codefendant Miller's attorney) asked Hicks if he had brought a lawyer to court with him, which he had. The deputy district attorney approached the bench and requested that Meyers be cited for misconduct. The objection was proper, but her attack was personal, and included a statement that "counsel has been a lawyer much too long." Charging counsel with bad faith, she asked that Meyers be cited for contempt. Nierenberg asked the court to admonish the prosecutor to address the court on legal issues and refrain from the constant, personal, vindictive statements of the last two to three days, and the court requested all parties to act professionally "like lawyers and not like people that come off the streets."

4. Shortly thereafter during questioning of the same witness, the court permitted Nierenberg to ask Hicks if he had talked to a lawyer. The prosecutor objected, saying that counsel knew better. At a bench conference the deputy district attorney reprimanded Nierenberg for being awfully noisy, stated "How dare they," and this time requested that Nierenberg be cited for misconduct.

5. The deputy district attorney, in objecting on the ground of relevancy to a particular line of cross-examination by deputy public defender Nierenberg, stated that when the time came the deputy public defender wanted to go on vacation she was not going to speed up the process of putting on relevant evidence.

"THE COURT: We don't need threats being made here as to what you are going to do.

[THE PROSECUTOR:] I know, but I just—

THE COURT: Will you please let me finish, for a change?

[THE PROSECUTOR:] All right.

THE COURT: Now, we don't need these threats being made, . . ."

6. Later, the deputy district attorney uncooperatively refused to stipulate to the foundation for a lineup, although she did not dispute that foundation and had herself been present at the lineup. She accused defense counsel of "screaming and yelling" and "yapping and screaming," and the court accused her of the same.

7. During the questioning of Chavez, a deaf and dumb mute who had been present during the robbery of the Club Mugen, the deputy district attorney alluded to a conversation between Chavez and the attorney with the yellow tie (Nierenberg). The latter volunteered to testify about the content of the conversation. The court called both attorneys to the bench and threatened to cite both for misconduct. The deputy district attorney appeared to be losing control of herself. The exchange went:

"[THE PROSECUTOR:] Your Honor—

THE COURT: Let him finish.

[THE PROSECUTOR:] He was all through and he interrupted me.

THE COURT: You stop it right now.

[THE PROSECUTOR:] I'm angry.

THE COURT: I know you are angry and I am angrier than you are, and I wear the black robe. Now, you shut up.

[THE PROSECUTOR:] Yes, you do wear a black robe."

8. Later, Nierenberg objected to a question by the deputy district attorney on the ground she was impeaching her own witness. She again appeared to lose control of herself, stated she didn't need to be reminded the court was wearing the robe, accused Nierenberg of lying, and said she could no longer tolerate Nierenberg's misconduct.

9. Next, Meyers asked a proper question of a police officer, namely whether he had ever taken the Club Mugen victims to a lineup. The deputy district attorney objected, and requested that Meyers be cited for misconduct. The court ruled the question was proper. Meyers again asked the question and the deputy district attorney again objected.

Rather than deal with the situation, the court dismissed the jury for the day.

10. Shortly afterwards the court attempted to get a simple stipulation regarding the impound of the Cadillac. Although defense counsel agreed to it, the deputy district attorney interpreted a remark by Nierenberg as nonagreement, and stated "we have no stipulation." The others claimed they did indeed have a stipulation. The court said, "I have had enough of all of you today" and adjourned the proceedings.

11. The following court day the court in chambers characterized the trial to that point as follows:

"In my opinion, Mr. Broady is the only one who has behaved in a professional fashion in this case; and, as I said, I include myself in that. As to that, I owe an apology to counsel. I have not kept control of these proceedings as I should; and, as a result of the failure to control it as I should have, I think it has degenerated into a Pier 6 brawl, and I don't think this serves the cause of justice.

"So to that extent I do apologize to all counsel and advise you that that condition is going to be attempted, very hard, to be corrected immediately."

Discussion followed. Nierenberg made the following request, set out here because it puts on record nonverbal conduct not otherwise apparent from the transcript:

"I would ask one thing, most respectfully, Your Honor. I am having trouble with it right now. As soon as [the prosecutor] says something or I object or I say something, the immediate thing that comes to mind or the image or impression is dirty glares, sinister looks, as though I am doing something wrong, by innuendo or otherwise; and it has just now occurred. She talks about attorneys as the man in the yellow tie—I do have an identity. I do have a name—or these attorneys, but she says it with a glare.

". . . . . . . . . . . . . . . .

"What I am asking for is, most respectfully, to have counsel for the People refrain from that kind of conduct in front of the jury. I don't

know at this point what effect it has, if any, but I do know, in speaking with Mr. Miller [co-defendant] on Thursday, at Mr. Meyers' request, that this was one of the prime concerns he had.

"He felt he wasn't getting a fair trial because he did not know what was transpiring at the bench every time we went up there; the excitement of all the parties. He didn't know what was going on with the coin flipping in the court and other conduct of that nature; and, again, I'd just like to do the trial and I'd like to complete it.

"My client is entitled to have a fair trial and I would ask the Court to just take that into consideration; that if it does occur, please advise [the prosecutor] at the bench or whatever, so it doesn't happen again, because it is a constant thing.

"Also, I'll be quite frank, it affects me emotionally, takes me off stride possibly, and that may very well create a problem for my client in my representing him, and it has gone on from the first day we started these proceedings and it has just picked up and magnified totally out of context, and I don't see any reason for it."

The court acknowledged that such conduct had occurred but also faulted Nierenberg, to a lesser degree:

"THE COURT: I don't think it is necessary. My only observation was going to be, Mr. Nierenberg, that I don't countenance some of the things that have been done in this trial, including some of the innuendoes, and looks, and all those things that you are talking about.

"By the same token, I certainly cannot countenance the blow-up which you had with her after court was over. I think if I had been in those shoes and I was practicing law, and you blew up at me the way you blew up at her, I might feel some kind of resentment and take it out on you in one fashion or another."

12. To these statements the deputy district attorney responded in part:

"I do not like Mr. Nierenberg. I do not like the things that he has done. I am a good lawyer and I know how to conduct myself as such. I will not tolerate his double talk nor his trying to put different documents together than are in fact true, or inferring things that are not true, and I

must object because I represent the People of the State of California and will do it to the best of my ability.

"His conduct was reprehensible. I do not wish to speak to him other than on the record and, as a matter of fact, under State Bar rules, conduct and ethics, what he did is subject to reprimand."

The judge responded that counsel should try the cause as lawyers and not as alley cats.

Meyers then moved for a mistrial, citing as grounds the cumulative misconduct of the prosecutor, the circus atmosphere of the trial, raucous laughter of jury and judge, hostility of the deputy district attorney, and her flippancy on certain occasions. He also asserted the judge had lost his temper, yelled, pounded the deck, and told the lawyers to shut up. He felt that the trial had degenerated into a farce and maybe a sham. (The motion for mistrial was subsequently denied.)

13. To the motion for mistrial the deputy district attorney made the following provocative and unprofessional remark: ". . . If I had been a male lawyer, someone would have hit each one of you, except Mr. Broady, of course, right square in the face. There is no doubt in my mind about that."

14. In further comment to the trial judge on the motion for mistrial, the deputy district attorney expressed her personal belief in the defendants' guilt and ridiculed their defense in sarcastic terms: "These defendants are vicious, bad people. I have done nothing wrong. There is nothing prejudicial on anything I have done. They killed somebody's father. They killed somebody's husband, and the poor baby doesn't like the way someone identifies him. I don't feel sorry for him. They think they are cute. They did not stop doing it."

15. In further response to the motion for mistrial, the deputy district attorney attempted to justify to the trial judge her prior misconduct in *People* v. *Mendoza* (1974) 37 Cal.App.3d 717 [12 Cal.Rptr. 565], by asserting that both Justices Ross [Roth] and Fleming of this division personally talked to her about that case and suggested that she have a little compassion (an assertion best described as the product of fantasy and creative imagination). She then continued: "So don't say that I did anything prejudicial. What is prejudicial is sometimes I win."

16. Next, defendant Miller described his impression of his trial: "DEFENDANT MILLER: I mean there's little things like the prosecutor does, so far as making little, short remarks to the jury, you know, when the attorneys don't see it; you know, the way she has attacked the attorneys, and we don't do things—like it is a personal thing between her and them is what I am saying, a war between them, other than trying us." His description was apt; the war between the attorneys had become more interesting than the trial.

17. Another childish exchange occurred when Nierenberg requested that the deputy district attorney be admonished not to refer to a part of defendant's statement to a witness that had been ruled inadmissible. Her responses were "I can ask any questions I want" and "If I want to engage in misconduct I will just go ahead and do it." Again, the trial court let pass her contemptuous attitude toward the court.

18. The next instance of courtroom disruption was a minor shoving match between Nierenberg and the prosecutor while Nierenberg was addressing the court.

". . . Excuse me . . . you are leaning against me.

[THE PROSECUTOR:] Don't push me, Counsel.

MR. NIERENBERG: You are leaning against me. I wish you would move away.

THE COURT: I wish you would act like an adult.

MR. NIERENBERG: I am just asking her to lay off me. She is backing into me inadvertently. That's all I said."

19. On two occasions the deputy district attorney stated, out of the hearing of the jury, however, that the court's position was that the People don't have a fair trial. In the presence of the jury such a statement would be serious misconduct; at bench they are merely indicative of a paranoiac attitude.

20. The following flippancy occurred during oral argument to the jury:

"[THE PROSECUTOR:] He [Nierenberg] describes his client's [appellant's] characteristics.

Now, in the whole thing, he doesn't say he has pointed ears, he had slant eyes. He says 'Characteristics.'

Well, I'd say he was a pretty boy. That is a characteristic. Well, I guess beauty is in the eye of the beholder.

His mother may think he's pretty, and Nierenberg may think he's a pretty boy. He's kind of cute, but that's not a characteristic."

 Put together in one trial the foregoing activities of the deputy district attorney clearly comprise professional misconduct which violates the standard of behavior required from a public prosecutor. (*People* v. *Bain* (1971) 5 Cal.3d 839 [97 Cal.Rptr. 684, 489 P.2d 564].) American Bar Association, Standards for Criminal Justice, Prosecution Function (1974) section 5.2, sets out the standard of courtroom behavior required for a prosecutor.

"5.2 Courtroom decorum.

"(a) The prosecutor should support the authority of the court and the dignity of the trial courtroom by strict adherence to the rules of decorum and by manifesting an attitude of professional respect toward the judge, opposing counsel, witnesses, defendants, jurors and others in the courtroom.

"(b) When court is in session the prosecutor should address the court, not opposing counsel, on all matters relating to the case.

"(c) It is unprofessional conduct for a prosecutor to engage in behavior or tactics purposefully calculated to irritate or annoy the court or opposing counsel.

"(d) A prosecutor should comply promptly with all orders and directives of the court, but he has a duty to have the record reflect adverse rulings or judicial conduct which he considers prejudicial. He has a right to make respectful requests for reconsideration of adverse rulings." As the commentary to section 5.2 states: "The gravity of the human interests at stake in a criminal trial demands that the proceeding

be conducted in an orderly and dignified manner. . . . Rudeness and intemperance have no place in any court, especially in the relations between its professional members, the judge and lawyers." (ABA Standard, Prosecution Function (1971) *supra,* pp. 113-114.)[2]

It is scarcely open to question that threats by counsel in the courtroom to kick opposing counsel in the ankle, to hit him in the face, and to disrupt his vacation plans amount to unprofessional conduct. A fortiori, they amount to unprofessional conduct when coming from a public prosecutor. (*People* v. *Bain* (1971) 5 Cal.3d 839, 845-850 [97 Cal.Rptr. 684, 489 P.2d 564].)

On appeal the Attorney General in effect complains of a double standard governing prosecution and defense in that "only the prosecutor, as the 'glorified' representative of the People, can commit misconduct." He seems to conclude that the prosecutor should not be held to a higher standard of behavior than defense counsel and therefore misbehavior of one counsel cancels out misbehavior of the other.

In response, we first point out that all counsel are held to a uniform minimum standard of courtroom behavior, which is the professional standard of courtesy and decorum required for the pleading by counsel of causes at the bar. When counsel's conduct falls below the minimum standard, the conduct is unprofessional. The identical standard of professional behavior in court applies to prosecutor and defense counsel alike.

Nevertheless, it is true that a public prosecutor, as representative of the People, must satisfy additional standards of conduct by reason of his

---

[2]The commentary further observed that "far too many American judges have tended to allow their courtrooms to 'get out of hand,' thus encouraging bad manners, excessive and unregulated zeal and other habits which prolong trials, confuse jurors and generally demean the profession and the courts. Interestingly, the lawyers of the widest experience in hotly contested criminal cases share a conviction that a 'tightly run' courtroom is to be preferred over one which is lax. The latter, in this view, tends to lower the level of conduct to that of the least professional and most ill-mannered lawyer. Since the lawyers consulted and interviewed in depth (often recorded in verbatim transcripts) represented in the aggregate many hundreds of years of experience in the trial courts, this Committee attaches special significance to their views on the importance of courtroom decorum. Many of these consultants voiced apprehension that excesses of advocates are placing stresses on the adversary system tending to undermine if not defeat the basic objectives of a system of justice and indeed expose the adversary system itself to challenge."

position as the officer who possesses the power and authority to speak for the state. In practical effect the public prosecutor functions in a dual capacity—as both agent and principal, as both attorney and client. Because he exercises a dual function, the prosecutor possesses additional responsibilities and becomes subject to broader duties than does defense counsel, who only exercises the one function of agent-attorney. Thus a prosecutor is required to meet standards of candor and impartiality not demanded of defense counsel. For example, a prosecutor must disclose unfavorable aspects of his case; defense counsel can remain silent. A prosecutor must disclose unfavorable evidence relating to the accusation and must make available impeaching evidence relating to witnesses. Defense counsel need not do either. A conviction in a criminal cause may be reversed if the prosecutor suppresses material evidence (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 405-408 [121 Cal.Rptr. 261, 534 P.2d 1341]; *In re Ferguson* (1971) 5 Cal.3d 525, 531-532 [96 Cal.Rptr. 594, 487 P.2d 1234]; *Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194]; *Giglio* v. *United States* (1972) 405 U.S. 150, 153 [31 L.Ed.2d 104, 108, 92 S.Ct. 763]); makes improper comments during cross-examination (*People* v. *Wagner* (1975) 13 Cal.3d 612, 619-620 [119 Cal.Rptr. 457, 532 P.2d 105]; *People* v. *Perez* (1962) 58 Cal.2d 229, 240-241 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946]; makes improper references to extrinsic matters (*United States* v. *Whitmore* (D.C. Cir. 1973) 480 F.2d 1154, 1158 [156 App.D.C. 262]; *Berger* v. *United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629]); or fails to disclose important information to the defense (*United States* v. *Agurs* (1976) 427 U.S. 97, 110-111 [49 L.Ed.2d 342, 353-354, 96 S.Ct. 2392]). Lapses by defense counsel in these and other respects can never bring about reversal of an acquittal. To this extent the Attorney General's complaint about a double standard is correct, for "[t]he duty of the district attorney is not merely that of an advocate." (*In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234].)

Yet in numerous respects the situation of the prosecutor is overwhelmingly advantageous when compared to that of defense counsel. The prosecutor is not required to believe or disbelieve any particular witness. Defense counsel is more or less bound to accept his client's key assertions at face value. The prosecutor is not required to prosecute any particular defendant. Defense counsel, and in particular public defenders, must defend persons entitled to claim the benefit of their services. The prosecutor may modify charges, abandon charges, or throw in his hand. Defense counsel, by himself, can do none of these things. In short,

the prosecutor has tremendous freedom to rationally evaluate the merits of any accusation he brings and to pursue it accordingly. But with greater freedom comes greater responsibility. A prosecutor cannot keep his dual functions wholly separate, and to some extent he always remains the officer who acts for the state—even though in a given instance he may be merely arguing in his capacity as counsel. ■ Accordingly, imposition of a broader standard of conduct on the prosecutor than on defense counsel is justified by the different functions these attorneys perform, in that while they both function as attorneys and agents, the prosecutor exercises the sovereign power of the state as principal.

From this disparity in function and responsibility the conclusion follows that the prosecutor may not excuse his own misconduct by pointing the finger of blame at another. To put it bluntly, lapses of behavior by defense counsel do not excuse professional misconduct by a deputy district attorney. The Supreme Court had so held in *People* v. *Bain* (1971) 5 Cal.3d 839, 849 [97 Cal.Rptr. 684, 489 P.2d 564], stating, "A prosecutor's misconduct cannot be justified on the ground that defense counsel 'started it' with similar improprieties (*People* v. *Kirkes, supra*, 39 Cal.2d 719, 725-726 [249 P.2d 1]; *People* v. *Sampsell* (1950) 34 Cal.2d 757, 765 [214 P.2d 813]; *People* v. *Kramer* (1897) 117 Cal. 647, 650 [49 P. 842]; *People* v. *Talle, supra*, 111 Cal.App.2d 650, 677 [245 P.2d 633].)"

■ At bench, the prosecutor must accept full responsibility for intemperate and unprofessional conduct, which included personal attacks and threats against defense counsel, ridicule of defendants and their defense, and refusal on occasion to comply with the court's orders.

The issue of remedy for prosecutorial misconduct remains. Reversal of the judgment has been the remedy most frequently used in recent years, but reversal is not required unless prosecutorial misconduct has prejudiced the defendant's case. Here, the evidence against appellant on all counts was strong. Defendants were involved, while driving the stolen Cadillac, in a common pattern of similar armed robberies over a two-day period. Defendants were credibly identified by the victims, and much of the stolen property, including the stolen Cadillac, was recovered in defendants' possession. On such a record only egregious error at trial could be deemed prejudicial. On reviewing the entire record we are of opinion that prosecutorial misconduct did not prejudice appellant's case, but to the contrary may have helped it by generating jury sympathy to produce a hung jury on nine of twelve counts. We conclude that the

misconduct of the prosecutor does not require reversal of the judgment of conviction. (Cal. Const., art. VI, § 13.)

The judgment is affirmed.

Compton, J., and Beach, J., concurred.

A petition for a rehearing was denied January 6, 1978, and appellant's petition for a hearing by the Supreme Court was denied February 1, 1978.