[Crim. No. 1853.   Fourth Dist.   Mar. 21, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. JEANNE ATWOOD, Defendant and Appellant.

Cornell Ridley for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and David M. Rothman, Deputy Attorney General, for Plaintiff and Respondent.

BROWN (G.), J.—Defendant appeals from a judgment of conviction of assault with a deadly weapon with intent to com-

mit murder. Defendant admitted the shooting but denied intent. There is no claim that the evidence was insufficient to support the judgment. The only issue on appeal is whether the court erred prejudicially in overruling defendant's objection to the closing argument of the district attorney in which the district attorney told the jury that the circumstantial evidence rule did not apply to evidence presented by the defense.

Circumstantial evidence may be introduced and relied upon by both prosecution and defense in a criminal case. CALJIC Instruction No. 24 clearly stated that there are two kinds of evidence which may be introduced in court, direct and circumstantial. There is no limitation as to which side, defense or prosecution, may introduce such evidence. This being true, the court erred in overruling defendant's objection to the prosecutor's argument that circumstantial evidence did not apply to defendant's case.

Following the ruling about which defendant complains, the court explained to the jury that it was the sole judge of the facts and that the court was the sole judge of the law; that regardless of what the attorneys might argue respecting the applicable law, the court would tell the jury the law "and that is the law you are to take, not what counsel says the law is."

At the conclusion of argument, the court properly instructed the jury respecting circumstantial evidence, repeating the language of CALJIC Instructions Nos. 24, 26, 27, and 28. The error of the court in ruling on the objection to argument was mitigated by the court's action in telling the jury it would take the law from the court and not from counsel, and at the regular time for legal instructions the court instructed in proper language what the law was regarding circumstantial evidence. It is presumed that the jury followed the court's instructions. (*People* v. *Green,* 13 Cal.2d 37, 45 [87 P.2d 821]; *People* v. *Bigelow,* 165 Cal.App.2d 407, 414 [332 P.2d 162].)

We are of the opinion, after an examination of the entire record, including the evidence, that no prejudicial error resulted from the court's ruling which would indicate that there was a miscarriage of justice, or that it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (Cal. Const., art. VI, § 4½; *People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243].)

Defendant sought to establish that she suffered from psychomotor epilepsy; that at the time of the shooting she might have been having a psychomotor seizure, and had no conscious awareness of her activity. Testimony in this regard was in-

troduced through a physician as well as defendant herself. In this connection defendant testified:

". . . . all of a sudden — well, I remember turning my head, but not my body. I remember turning my head and he looked at me, didn't say a word. And then all of a sudden, and I don't remember, I was facing him and the gun was in my hand. And that's all, and that's the truth.

"Q. You don't remember pulling the gun? A. I do not remember taking the gun from my purse.

"Q. Do you remember turning around? A. I do not remember turning around.

"Q. Do you remember the gun going off? A. I remember the first gunshot.

"Q. *And at that time did you intend to pull the trigger? A. Not that I — no.*

"Q. Do you remember the second shot? A. No.

"Q. Do you remember the third shot? A. I don't know how many shots there were; only what I have read in the indictment.

"Q. All right. Now, when you turned around and you had the gun in your hand what was your state of mind? A. Very foggy.

"Q. And did things seem real or unreal to you? A. Unreal.

"Q. And were you aware of what was going on around you or not? A. Not at all." (Italics ours.)

Defendant's failure to remember the events of the shooting appeared to be fairly uniform, except her memory was clear that she did not intend to pull the trigger. This contradiction the jury was entitled to weigh and consider with the rest of the testimony. The evidence showed a year's course of hostile conduct on the part of the defendant toward her former lover, Paul Dixon, culminating in her shooting him. He had terminated an illicit relationship with defendant in April 1961. Contrary to his wish, defendant sought to continue the affair, with the hope he would divorce his wife and marry her. She harassed him by telephone, sometimes attempting to call him as many as 20 times a day. She rammed her car into his. When Dixon reported this incident to the police, defendant told the police officer that Dixon had taken three and a half years of her life and there should be some legal way he should be made to pay for it. In a later conversation she told the officer, "I am laying for these people. I am going

to get them before they get me." She followed his car; she parked behind his car at his place of work; she left a taped message for him, "You better get a lawyer. . . . you are not going to get away with ruining my life."

Defendant took three lengthy trips hoping to forget Dixon, but being unsuccessful, in February 1962 she purchased and moved into the house next door to Dixon's home. There she engaged in the daily practice of pounding metal, calculated to bother Dixon. She obtained a dog, named him "Paul," and walked him in front of Dixon's house, swearing at him. About this time she saw Dixon leave his place of business with another man, and she said to him, "I see you have your body-guard. You are certainly going to need one."

About a week before the shooting, Dixon was getting out of his car at his place of business and defendant was parked behind him. She said to him, "Are you sure you don't want to change your mind? This is your last chance."

The day of the shooting defendant had a soft drink at a shop across the street from Dixon's place of business. She appeared perfectly normal and in no way unusual. She then went to Dixon's office and was conducting a transaction involving documents with Dixon's associate when Dixon started to leave the office. Defendant fired three gun shots. One of the first two shots passed through Dixon's coat and across his chest; the third hit his neck and felled him. Defendant then fired a fourth shot at herself.

Defendant was removed to a hospital. The physician who treated her found her orientation was good. She answered his inquiry about her source of injury that she wished to consult her attorney and she did not want to tell the physician what happened.

This evidence clearly establishes the basis on which the jury concluded that defendant intended to do the act for which she was convicted. We are of the opinion, as stated above, that no prejudice resulted from the court's ruling during argument and that it is reasonably probable the result would have been no different had the court ruled otherwise.

Judgment affirmed.

Griffin, P. J., and Coughlin, J., concurred.