[Crim. No. 3166. Fifth Dist. Aug. 8, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
BERNARD VINDIOLA, Defendant and Appellant.

COUNSEL

Paul Halvonik and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal and Gary S. Goodpaster, Chief Assistant State Public Defender, for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Charles P. Just, Emry J. Allen and Charles J. James, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BROWN (G. A.), P. J.—Appellant, Bernard Vindiola, was convicted of second degree murder and personal use of a firearm in the commission of the offense in violation of Penal Code sections 187 and 12022.5. The cumulative effect of a number of errors commands reversal.

FACTS

After midnight on July 22, 1976, the victim, T. J. McCoy, was a security guard at the Peek-a-Boo Bar in Fowler, California. There were 75 to 85 people in the bar at that time. The lighting condition in the bar was dark. Appellant, his brother, Eddie Vindiola, several sisters and some friends were there. Christina Vindiola got into a fight with her sisters, Rosie and Elena, and with Eddie's girl friend, Martina Rocha. The victim attempted to intervene and stop the fight. In the process he was shot three times, which resulted in his death later.

After the shooting Christina Vindiola remained at the bar. She told a number of people that her brother, Eddie, had a gun and had shot the security guard.

Four prosecution witnesses testified as to what they observed happen when the victim was shot. The testimony of each witness and any inconsistencies will be discussed in turn.

Dolores Walls was employed as a barmaid at the Peek-a-Boo Bar on the night of the shooting. At the critical time she was walking back to the restroom area of the bar to talk to a member of the band. She walked past

the area where the fight was occurring. She saw a man walk from one area up to the bar to the fight. She saw the man raise his right arm and extend it straight out. She did not see whether there was anything in his hand because she was about 44 feet away from him and because there was a crowd of more than 10 people around the area where the women were fighting. The man was standing with the crowd about three to four feet from the victim when Walls heard several shots fired. She could not tell who was doing the shooting, although when the shots were fired the man had his arm pointing toward the victim. After the shots were fired she lost track of the man in the crowd.

At trial she identified appellant as being the man she saw that night. At a photo lineup she picked out appellant's picture as the man she had seen. She testified that at a subsequent physical lineup on July 29 she identified appellant as the person who most looked like the man she had seen on that night. She had seen appellant once prior to that night.

Vaughn Donabedian was a customer at the bar on the evening of the shooting. He saw the fight begin among the women about four to six feet in front of him and saw the victim go over to break it up. He heard a shot and looked over to the area of the fight. He saw a man with an upraised, extended arm holding a gun. He saw the man fire two more shots within a foot of the victim. The man stepped back, brought the gun down to his side, started to walk out of the bar, briefly stopped and then walked out. He followed the man outside.

Once outside, an unidentified bystander said to the man in Spanish, "You have killed him." The man ran around the north side of the bar and got into the back seat of a car containing approximately four people. It should be noted that members of appellant's family at the trial testified that appellant was not in the back seat—he was driving the car. They testified that appellant's brother, Eddie, who cannot drive a car, was in the back seat.

Donabedian described the man he saw as a Mexican male, about five feet ten inches tall, with a moustache and fairly long hair, black and combed straight back, reaching almost to the collar. He said he was in his late 20's or early 30's. Appellant is 21 years old. The man wore a white T-shirt. At trial, Donabedian identified appellant as the individual he saw.

The day after the shooting Donabedian was shown a series of photographs which included appellant. However, he could not identify any of them as the man he had seen that evening. On July 26 he was shown a physical lineup which did not include appellant, at which he identified someone other than appellant as the man he had seen. The day after the physical lineup, Donabedian contacted the sheriff's department and told them that he had identified the wrong person in the lineup. He also stated at that time that there was no one else in the lineup he felt was responsible.

At trial, he claimed that appellant had been in the July 26 lineup.

On July 27 Donabedian was shown a second photo lineup and identified appellant as the man described above.

Jesse Rodriguez was the owner of the bar and was working there on the night in question. He saw the fight begin among the women and observed the victim go over to break it up. He saw a man get up from one of the tables, walk to the area of the fight, and extend his right arm above the shoulder. Jesse described the man as being a Mexican male, 5 feet 7 inches to 5 feet 10 inches, weighing 160 to 170 pounds, with black, shoulder-length hair, a few days' growth of facial hair but no beard, who wore a white T-shirt and dark Levi's. The man started walking toward the front of the bar when Jesse heard three or four shots. Jesse had not seen anyone actually shoot the security guard nor anyone with a gun. Jesse left to call the police and came back. He saw the same man walking toward him in the direction of the exit. The man saw Jesse and stopped. Jesse observed his hand go down to his pocket or belt. Jesse said to the man, "I seen you." At that point the man left the bar. The man was not walking any faster than anyone else on the premises.

At trial, Jesse positively identified appellant as the man described above.

On July 23, the day after the shooting, Jesse was shown a photo lineup which included appellant's picture but could not identify any of them as the man he had seen. On July 26 he was shown a physical lineup which did not include appellant and identified Eddie Vindiola as the man he had seen. On July 29 he attended a second physical lineup and identified appellant as the man described above.

Ron Rodrigues was the nephew of the owner of the bar and was working there that night. He saw the fight and heard some shots. He did not see who fired the shots. After hearing the shots, he saw a man running toward the front of the bar with something that looked like a black handle protruding from his waistband. He described the man as being a Mexican male, 5 feet 7 inches to 5 feet 11 inches, weighing between 160 and 180 pounds, wearing dark trousers and a white T-shirt with a hole in it. Ron testified at trial that appellant resembled the individual he saw at the bar but could not make a positive identification. He noted that appellant looked a lot "skinnier" and "more well kept."

Appellant is six feet one inch; Eddie is five feet nine inches.

On July 23, the day after the shooting, Ron was shown a photo lineup which included appellant's picture. He could not identify any of them as the man he had seen. On July 26 he was shown a physical lineup which included appellant and identified Eddie Vindiola as the man he had seen.

On July 25, 1976, Eddie Vindiola was arrested for the shooting of the victim.

Christina Vindiola, a sister of appellant and Eddie Vindiola, testified that she had told officers at the bar on the night of the murder that Eddie had shot the victim because she was angry with Eddie. Walls, Jesse Rodriguez and Donabedian were present and heard those accusations. At trial, she stated that she did not know if Eddie had a gun that evening. Christina also stated at trial that she did not know whether or not Eddie shot the victim. She testified that Eddie was at the bar on the evening in question but was wearing a brown shirt.

On July 27 appellant was arrested at 2 p.m.

Outside the presence of the jury, both Donabedian and Jesse Rodriguez testified that their in-court identifications were based upon their observations at the scene of the crime. The court found that the in-court identifications were untainted by pretrial identification procedures.

Appellant's defense was that his older brother, Eddie, shot the victim.

### DISCUSSION

██ A deputy sheriff was permitted over a hearsay objection to testify on redirect examination to statements made by witness Ron Rodriguez on the occasion of the lineup. The deputy sheriff testified:

"Q. Did Ron Rodriguez identify anybody?

"A. Not as an individual standing in the lineup.

"Q. What did he say?

"A. He advised that the——

"[Appellant]: Objection, your Honor, hearsay.

"THE COURT: This I will allow, not for the truth of the statement but for what was reported by him to the officer.

"[Prosecution]: Q. What did he say?

"A. He advised that Number 1 was not the subject that shot the victim; it was his younger brother.

"Q. And Number 1 was who again?

"A. Adrian Edward Vindiola.

"THE COURT: Who was Number 1?

"A. Adrian Edward Vindiola.

"[Prosecution]: Q. I believe you stated——

"THE COURT: Who did you understand his younger brother to be?

"A. At that time I believed it to be Bernard."

Thus, while the trial court in effect sustained the hearsay objection, the court admitted the statement on its own motion to show "what was reported by him to the officer."

However, the mere fact the statement was made is irrelevant to any issue before the court and is not pertinent to the trial testimony. (Cf., *People* v. *Baeske* (1976) 58 Cal.App.3d 775, 780 [130 Cal.Rptr. 35].) The testimony therefore was not admissible on any ground. Since it was not admissible on any ground, the hearsay objection to its admissibility was sufficient to preserve the issue on appeal. (*People* v. *Terry* (1962) 57 Cal.2d 538, 567-568 [21 Cal.Rptr. 185, 370 P.2d 985]; *Swan* v. *Thompson* (1899) 124 Cal. 193, 195 [56 P. 878].) It follows that the court erred in

admitting this hearsay testimony which went to the heart of appellant's defense in that it identified appellant rather than his brother Eddie as being the killer.

■ The trial court also committed error in not permitting appellant to impeach witness Eddie Vindiola by introducing evidence that he had been convicted of auto theft (Veh. Code, § 10851), a felony. The trial court's ruling was based on its perception that Eddie had not testified to anything that was adverse or harmful to appellant. However, Eddie testified he had never seen the victim, which carries the clear implication of a denial that he had shot him and was testimony adverse to the central theme of appellant's defense that it was Eddie and not appellant who committed the homicide.

■ The well-known *Beagle* (*People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1]) factors which should be considered by the trial court in the exercise of its discretion in determining whether to permit a defendant witness to be impeached with evidence of prior felony convictions were held to be applicable to nonparty witnesses in *People* v. *Woodard* (1979) 23 Cal.3d 329, 338-339 [152 Cal.Rptr. 536, 590 P.2d 391].) The *Woodard* court said: "[T]he discretion called for by section 352 and by the *Beagle* line of decisions of this court must be exercised whenever a party—plaintiff or defendant, in a civil or criminal case—moves for the exclusion of a witness' prior felony conviction. While the factors to be weighed may differ depending upon the nature of the case or the party who may be prejudiced, the weighing process is applicable to all cases." (*People* v. *Woodard, supra,* 23 Cal.3d at pp. 338-339.)

The fact that it is a defendant who seeks to use prior felony convictions to impeach an adverse witness should weigh in favor of permitting the evidence as impeachment. (*People* v. *Stevenson* (1978) 79 Cal.App.3d 976, 989-990 [145 Cal.Rptr. 301].)

The *Beagle* factors are: (1) does the prior conviction " 'rest on dishonest conduct' " so as to relate to credibility (as opposed to assaultive or violent crimes which do not); (2) the " 'nearness or remoteness of the prior conviction' "; (3) whether the prior conviction was for " 'the same or substantially similar conduct for which the accused is on trial' "; and (4) whether the defendant will be deterred from taking the stand on his behalf. (*People* v. *Beagle, supra,* 6 Cal.3d at p. 453.)

■ Weighing these factors in the instant case we conclude that the court abused its discretion in denying the admission of the prior auto theft conviction to impeach Eddie. None of the factors appears to weigh against admitting the prior conviction because that conviction is a crime which establishes traits of dishonesty and has relevance on the issue of credibility, it was not similar to the present charge—murder, and it was not remote in time because Eddie had not led a blameless life since his conviction (Eddie had been recently arrested on a parole violation). Further, the impeachment of Eddie would have benefited appellant—a criminal defendant. Finally, its use would not have kept Eddie off the stand as he had already testified.

■ Next appellant contends that the trial court committed prejudicial error in admitting two hearsay statements as adoptive admissions and in failing to instruct *sua sponte* in the language of CALJIC No. 2.71.5 concerning the circumstances under which such evidence is available, the foundational requisites for its admission, and the limitation on the use of such evidence.

Accusatory statements made to a defendant which an innocent man would be expected to deny are admissible as adoptive admissions: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.)

"If the accused responds to the [accusatory statements] with a flat denial, there is no admission and hence nothing that may be received in evidence. If, on the contrary, the truth of the statement is admitted, the statement may properly be introduced. A third situation is presented when the accused stands mute in the face of the accusation or responds with an evasive or equivocal reply. In that situation this court has held that *under certain circumstances* both the statement and the fact of the accused's failure to deny are admissible on a criminal trial as evidence of the acquiescence of the accused in the truth of the statement or as indicative of a consciousness of guilt." (*People v. Simmons* (1946) 28 Cal.2d 699, 712 [172 P.2d 18].)

The first instance was the admission of the testimony of Jesse Rodriguez, who stated that after the fight among the women started in the bar and the security guard went over to the dance floor to break it up, he saw a man come from the area of the tables to the dance floor and raise

his right arm in an extended position above the shoulder. The man then started to walk toward the front of the bar, and afterwards Mr. Rodriguez heard three or four shots. The man stopped for a few seconds before leaving the bar, at which time Mr. Rodriguez testified that he said to the man, "I seen you." The man then left the bar. Jesse Rodriguez identified appellant as being the man in question. No objection was made to this testimony.　■　The failure to object to adoptive admissions testimony constitutes a waiver and prevents a defendant from challenging the admissibility of such evidence on appeal. (*People* v. *Millum* (1954) 42 Cal.2d 524, 528 [267 P.2d 1039]; *People* v. *Stepp* (1947) 82 Cal.App.2d 49, 51 [185 P.2d 417].)

■　The second instance was the admission of the testimony of witness Vaughn Donabedian who stated that he observed a man shoot the victim several times and then walk out of the bar. Donabedian, who followed the man outside, testified that an unidentified bystander said to the man in Spanish, "You have killed him."[1]

To this testimony appellant made only a hearsay objection. However, the focus of his argument on appeal goes to the foundational defects of the testimony at issue. It is argued that the circumstances surrounding the making of the accusatory statements failed to establish that Donabedian understood Spanish, that appellant understood Spanish, and that appellant heard and understood the accusatory statement. Donabedian stated that he knew what was said in Spanish. A reasonable inference from this is that Donabedian understood Spanish. A reasonable inference can be drawn from Donabedian's testimony that he, the bystander who made the accusatory statement and the appellant were together outside the bar. Possibly a reasonable inference could be drawn that appellant was close

---

[1] The relevant portions of the transcript consisted of the following:

"Q. What happened then?

"A. Ah—Somebody came out of the bar and told him in Spanish—

"[Appellant]: Objection, your Honor, hearsay.

"THE COURT: Overruled.

"[Appellant]: What somebody else told somebody?

"THE COURT: Do you know what he said in Spanish?

"A. Yes.

"THE COURT: All right.

"[Appellant]: Your Honor, it is not exception—what somebody else said—

"THE COURT: Told the defendant what he said, that is not hearsay, Counsel. Overruled.

"[Prosecution]: Q. What did this person say to the defendant?

"A. Told him in Spanish that you have killed him.

"Q. And what, if anything, did the defendant do then?

"A. Ah—Ran around the north side of the bar and they got in a car that was parked in the driveway there."

enough to the bystander to have heard the statement. (Cf., *People* v. *Brown* (1948) 87 Cal.App.2d 281, 285 [196 P.2d 936].) However, there was no direct evidence that appellant understood and spoke Spanish, which was a necessary foundational prerequisite to the admissibility of the testimony.

While a judge should make preliminary determinations of the foundational requirements before the statement is admitted before the jury (*People* v. *Simmons, supra,* 28 Cal.2d 699, 713), the foundational requirement in this instance was waived by appellant by not having requested such a hearing or objecting upon this ground. (See *People* v. *Millum, supra,* 42 Cal.2d 524, 528; *People* v. *Atwood* (1963) 223 Cal.App.2d 316, 330 [29 Cal.Rptr. 463]; *People* v. *Stepp, supra,* 82 Cal.App.2d 49, 51.)

■ The court committed error in failing to instruct *sua sponte* in the language of CALJIC No. 2.71.5[2] on adoptive admissions. (*People* v. *Atwood, supra,* 223 Cal.App.2d 316, 332-334.) In *Atwood* the court reasoned that the principles outlined in an appropriate instruction (such as CALJIC No. 2.71.5, then CALJIC Nos. 30 and 30-A) were properly defined as "general principles of law governing the case" because they comprise " 'principles of law commonly or closely and openly connected with the facts of the case before the court' " (*id.,* at p. 332) and are necessary and vital to a proper consideration of the evidence before the jury. (See also *People* v. *Putnam* (1942) 20 Cal.2d 885, 890 [129 P.2d 367] (disapproved on other grounds in *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 882 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845]).) We note that cognate principles apply to the *sua sponte* duty to give an instruction as to the nature and effect of extrajudicial oral admissions. (*People* v. *Beagle, supra,* 6 Cal.3d 441, 445; *People* v. *Ford* (1964) 60 Cal.2d 772, 799 [36 Cal.Rptr. 620, 338 P.2d 892].)

---

[2]CALJIC No. 2.71.5 provides: "If you should find from the evidence that there was an occasion when the defendant, under conditions which reasonably afforded him an opportunity to reply, failed to make denial [or made false, evasive or contradictory statements,] in the face of an accusation, expressed directly to him or in his presence, charging him with the crime for which he now is on trial or tending to connect him with its commission, and if you should find that he heard the accusation and understood its nature; the circumstance of his silence [and conduct] on that occasion may be considered against him as indicating an admission that the accusation thus made was true. Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence [and conduct] of the accused in the face of it; and unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement."

Because the two pieces of evidence referred to were only admissible on the theory of adoptive admissions, it was imperative that the jury be instructed on the foundational requirements for the use of the admissions (whether the accusatory statements were made, whether they were directed to appellant, whether he heard and understood the statements, whether they were made under conditions fairly offering him an opportunity to reply, and whether he failed to make a denial thereof). It was also necessary to advise the jury that the accusatory statements were not received for the purpose of proving their truth and that "unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement." (CALJIC No. 2.71.5.) Without the instruction the jury was left entirely without guidance and was not permitted to entirely disregard the statements. This lack of guidance amounted to egregious error going to the entire issue of identification in the defense case.

■ There is another error urged in the admission of certain booking photographs of appellant. Carmen Delgado, appellant's sister, testified she had never seen appellant with a moustache or attempt to grow a moustache. Donabedian had testified that the person who shot the victim wore a heavy moustache, and Jesse Rodriguez had stated that the assailant had a few days' growth of facial hair but no beard.

To impeach Delgado and to present evidence directly relevant to the validity of the eyewitness identification of Rodriguez and Donabedian, the prosecutor presented two booking photographs (exhibits A-2 and 9) purportedly[3] taken when appellant was booked for the current offense on July 27, 1976, which show appellant with a beard. No objection was made to these photographs.

However, the prosecution gilded the lily by producing and introducing into evidence for the same purpose three more booking photographs[4] (exhibits 10.1, 10.2, 10.3), over objection, which were admittedly taken in

---

[3]Though no issue was made of the point, it appears that exhibit A-2 was probably taken in 1974. The usual identification mug shot information on that photograph was taped over but the 1974 date is clearly visible when the picture is held to the light.

[4]While there is no writing on the photographs indicating they are booking photographs, they have that familiar and unmistakable appearance. There is a blanked-over area at the bottom of the photographs which visibly shows that something has been blocked off. Moreover, the pose, the expressionless and wooden, enigmatic appearance of mug shots taken against a colorless background is familiar to most citizens from commonly viewed pictures of wanted criminals viewed at post office bulletin boards, in magazines and on television.

1974. The photographs show appellant with a moustache. Contrary to appellant's argument, a sufficient foundation for the impeachment of Delgado with these photos had been shown in that in addition to being appellant's sister, she testified she had seen him over the past "several years" at different times, from which it could be reasonably inferred that she saw him in 1974.

However, the objection that the trial court abused its discretion in admitting the photographs because their prejudicial impact outweighed their probative value (Evid. Code, § 352) is more difficult to refute, especially in view of the fact that the photograph (exhibit 9) of the booking on the current offense, taken a few days after the offense, shows appellant with a moustache. In view of this, the use of the 1974 booking photographs for any legitimate purpose appears to have been unnecessary. The booking photographs taken in prior years carry the inevitable implication that appellant suffered previous arrests and perhaps convictions and was error. (*People* v. *Cook* (1967) 252 Cal.App.2d 25 [60 Cal.Rptr. 133]; see also *United States* v. *Harrington* (2d Cir. 1973) 490 F.2d 487, 495.) The mug shots make "the difference between the trial of a man presumptively innocent of any criminal wrongdoing and the trial of a known convict" (*United States* v. *Reed* (7th Cir. 1967) 376 F.2d 226, 228) and may well be equivalent to the introduction of direct evidence of prior criminal conduct. (*United States* v. *Harrington, supra,* 490 F.2d 487.) As such, a jury could well conclude that the appellant had a disposition to commit offenses, and the error therefore is of serious proportion.

■ Appellant argues that he is entitled to reversal because the trial court refused to give certain requested instructions directing the jury's attention to evidence from the consideration of which reasonable doubt of defendant's guilt might be engendered. An example of the instructions so requested is set forth in the margin.[5]

---

[5]"You are instructed that you are the final judge of the accuracy and the credibility of such identification. Therefore, you should take into consideration all of the facts and circumstances relating to the in-court identification of the accused. Such factors would include, but not be limited to:

"a) The opportunity of the witness to observe the perpetrator at the time the crime was committed.

"b) The extent and accuracy of his or her description of the perpetrator.

"c) Whether or not the witness is certain of his/her identification, and the degree of that certainty.

"d) Any observation by the identifying witness of the commission of the alleged crime.

"e) The age, apparent intelligence and demeanor of the identifying witness.

"f) The physical circumstances under which the witness observed the perpetrator, such

The court did instruct substantially in the language of CALJIC No. 2.20[6] and CALJIC No. 2.91 (as modified).[7] It will be noted that one of the modifications was to add the language "you should carefully consider and evaluate the credibility of each identification witness and the factors upon which he bases his identification," thereby in a general way relating the testimony of identification witnesses to the credibility factors listed in CALJIC No. 2.20.

While it is true that the court in *People* v. *Guzman* (1975) 47 Cal.App.3d 380, 387 [121 Cal.Rptr. 69], stated ". . . a defendant is

as the presence or lack of visual obstructions, and lighting.

"g) Whether the witness has failed to identify the same person on other occasions or has identified another person.

"h) Whether, after cross-examination of the identifying witness, the testimony remains as positive and unqualified.

"It is not necessary for the defendant to prove that another person may have committed the crime, nor is it the burden of the defendant to prove his innocence. If facts and circumstances have been introduced into evidence which raise a reasonable doubt as to whether the defendant was the person who committed the crime charged, then you should find the defendant not guilty of the offense(s) charged."

[6]The reporter's transcript of the proceedings indicates that the court instructed:

"Every person who testifies under oath is a witness. You are the sole and exclusive judges of the credibility of the witnesses who have testified in this case.

"In determining the credibility of the witness you may consider any matter that has a tendency in reason to prove or disprove the truthfulness of his testimony, including but not limited to the following:

"His demeanor while testifying and the manner in which he testifies; the extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies; the extent of his opportunity to perceive any matter about which he testifies:

"The existence or non-existence of a bias, interest, or other motive:

"A statement previously made by him that is consistent with his testimony:

"A statement made by him that is inconsistent with any part of his testimony:

"The existence or non-existence of any fact testified to by him:

"His attitude toward the action in which he testifies or toward the giving of testimony; his admission of untruthfulness; his prior conviction of a felony."

[7]The reporter's transcript of the proceedings indicates that the court instructed:

"You are instructed that the identity of the defendant as the person who committed the crime is an element of every crime. Therefore, the burden is on the state to prove not only that the crime alleged was committed, but also that the defendant was the one who committed it. *In this respect you should carefully consider and evaluate the credibility of each identification witness and the factors upon which he bases his identification* and you must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant as the person who committed the offense before you may convict him.

"In this regard, you are instructed that it is not necessary for the defendant to prove that another person may have committed the crime, nor is it the burden of the defendant to prove his innocence. If facts and circumstances have been introduced into evidence which will raise a reasonable doubt as to whether the defendant was the person who committed the crime charged, you must give the defendant the benefit of that doubt and find him not guilty." (The italicized portion was added by the court.)

entitled to an instruction directing the jury's attention to evidence from the consideration of which reasonable doubt of defendant's guilt might be engendered," we have found no case that has followed that language or required such an instruction, though several cases have had the opportunity to pass upon the issue and the language of *Guzman*. (See *People* v. *Kelley* (1977) 75 Cal.App.3d 672, 679 [142 Cal.Rptr. 457]; *People* v. *Smith* (1977) 67 Cal.App.3d 45, 49 [136 Cal.Rptr. 387]; *People* v. *Boothe* (1977) 65 Cal.App.3d 685, 689-690 [135 Cal.Rptr. 570].)

Moreover, it would appear that much of the requested instruction tends to violate some fundamental precepts of the duty of the court in instructing the jury. That duty is to instruct the jury "on any points of law pertinent to the issue" (Pen. Code, § 1093, subd. 6) "but not with respect to matters of fact . . ." (Pen. Code, § 1127). (See *People* v. *Castellano* (1978) 79 Cal.App.3d 844, 855-858 [145 Cal.Rptr. 264].) In addition, as observed in *People* v. *Smith, supra,* 67 Cal.App.3d 45, 49: "Unavoidably, the more precisely a trial court instructs a jury on the factors it should consider in deciding an issue, the more it will suggest the weight that should be given the testimony of particular witnesses. Yet it is improper for a court to single out a particular witness and charge the jury how his evidence should be considered [citations]."

In the absence of a definitive holding by the Supreme Court we opt to follow the cases which hold that an instruction in the language of CALJIC Nos. 2.20 (see fn. 6, *ante*) and 2.91 (see fn. 7, *ante*) sufficiently fulfills the court's duty to instruct on the law applicable to identification testimony. (See *People* v. *Kelley, supra,* 75 Cal.App.3d 672; *People* v. *Smith, supra,* 67 Cal.App.3d 45; *People* v. *Boothe, supra,* 65 Cal.App.3d 685.)

■ Notwithstanding our conclusion that there was no error with respect to the giving of a *Guzman*-type instruction on the identification issue, we are of the opinion that the other errors—hearsay statement of Ron Rodriguez identifying appellant rather than Eddie as the murderer, excluding evidence of Eddie's prior conviction of auto theft by way of impeachment, failure to properly instruct on the requirements and effects of an adoptive admission, and the admission into evidence of booking photographs taken on a prior occasion—compel a reversal.

Two principles coalesce to demand this result. First is the cumulative effect of the several errors we have enumerated. The second is that in

applying the test of *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], the Supreme Court has often emphasized that when a case is closely balanced it is more likely to be "reasonably probable that a verdict more favorable to the [appealing party] might have resulted if the error had not occurred." (Cf., *People* v. *Hannon* (1977) 19 Cal.3d 588, 603 [138 Cal.Rptr. 885, 564 P.2d 1203]; *People* v. *Wagner* (1975) 13 Cal.3d 612, 621 [119 Cal.Rptr. 457, 532 P.2d 105].) As we shall explain, this was a close case on the critical issue of identification.

As the prosecutor stated in his closing remarks, the issue was whether appellant or his brother, Eddie, killed the security guard. The validity of the identification evidence is therefore crucial. Focusing on the evidence on that issue shows it to be shaky and uncertain.

The lighting condition in the bar was dark, and it was crowded with 75 to 85 people. Only the witness Vaughn Donabedian claimed to have seen appellant shoot McCoy. However, the reliability of his identification was poor. First, he was shown a group of photographs, including appellant's, the day after the shooting but could not identify any of them as the man he had seen. Second, he was shown a physical lineup three days later and identified someone other than appellant as the killer. He claimed at trial that appellant had been in that lineup, which was incorrect. Third, shortly after the shooting he said that the man was 5 feet 10 inches and was in his late 20's or early 30's and had a heavy, bushy moustache; appellant is 6 feet 1 inch, 21 years old, and his efforts to grow a moustache were only modestly successful. Finally, he was positive that the killer had gotten in the back seat just before the car drove away. There was testimony that Eddie, who was unable to drive, got in the back seat, whereas appellant was in the front seat driving.

The other two witnesses (Dolores Walls and Jesse Rodriguez) testified that they had seen a man walk over to the area of the fight and put his arm in the air. Neither saw a gun in the man's hand or saw the shooting. Jesse Rodriguez had been shown some photographs, including appellant's, the day after the shooting but made no identification. Three days later in a lineup he identified someone other than appellant as the man he had seen. Further, he testified that the man he had seen was five feet seven inches to five feet ten inches, whereas appellant is six feet one inch.

Ron Rodriguez saw a man leave the bar after the shooting with something resembling a black handle protruding from his waistband. However, he could not say that appellant was the man; he had not been

able to identify appellant from photographs, and he had picked some-body other than appellant at a physical lineup. Rodriguez said the man was five feet seven inches to five feet eleven inches; appellant is six feet one inch.

While witness Dolores Walls made a correct identification both at a photographic lineup and at a subsequent physical lineup, she did not in fact see whether there was anything in the hand of the man who had raised his right arm and extended it straight out toward the victim and could not tell who in fact was doing the shooting. She was about 44 feet away from the victim, and there was a crowd of more than 10 people around the area where the women were fighting, which she indicated accounted for the fact that she could not see whether there was anything in the raised hand of the person.

Much evidence pointed to Eddie as the killer. He had a gun two days earlier, and Christina had said he had a gun that night. He had a motive to enter the fracas since his girl friend, Martina Rocha, was involved in the fight that the security guard broke up. Both Jesse Rodriguez and Ron Rodriguez had picked him out of the July 26 lineup as the man they had seen. His height, five feet nine inches, was much closer to the description given by three witnesses than appellant's six feet one inch. His age, 28, was much closer to Donabedian's description of the man as in his late 20's or early 30's than appellant's, who was 21 years old. Appellant's girl friend was not involved in the fight or with the security guard. There was persuasive evidence that it was Eddie, not appellant, who entered the back seat of the car where Donabedian testified the killer sat.

In light of the closeness of the evidence on the identification issue, we cannot say that had the cumulative errors not occurred it was not reasonably probable that a verdict more favorable to the appellant might have resulted. Accordingly, the judgment will be reversed.

In light of the reversal on the grounds stated it is unnecessary for us to discuss or dispose of appellant's contention that appellant was denied his rights under article I, section 15, of the California Constitution, guaranteeing him a right to counsel because no counsel was afforded to him at the preindictment lineup. (See *Kirby* v. *Illinois* (1972) 406 U.S. 682 [32 L.Ed.2d 411, 92 S.Ct. 1877]; *People* v. *Chojnacky* (1973) 8 Cal.3d 759 [106 Cal.Rptr. 106, 505 P.2d 530]; *People* v. *Williams* (1977) 68 Cal.App.3d 36, 42 [137 Cal.Rptr. 70].) Nor is it necessary for us to discuss appellant's contention of sentencing error.

The judgment is reversed.

Zenovich, J., concurred.

**HOPPER, J.**—I concur in the judgment and generally in the opinion except for the part discussing the requested instruction on identification. I would also hold that it is error to refuse to give such an instruction upon request (see *People* v. *Hurley* (1979) 95 Cal.App.3d 895 [157 Cal.Rptr. 364], Hopper, J., dis.).