Filed 11/27/24  P. v. Jackson CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PATRICK JACKSON,<br><br>    Defendant and Appellant. | A168657<br><br>(City & County of San Francisco<br>Super. Ct. No. SCN233139) |

A jury convicted Patrick Jackson of the first degree murder of Richard Ponce.  (Pen. Code, § 187; statutory references are to this code, unless we specify otherwise.)  The trial court imposed a sentence of 25 years to life in prison.  On appeal, Jackson contends the judgment must be reversed because (1) the trial court violated his constitutional right to confront witnesses; (2) the prosecution committed misconduct; (3) the jury was exposed to inadmissible material during deliberations; and (4) the jury committed misconduct.  Jackson also contends that fines and fees imposed at sentencing are unconstitutional.  We affirm.

## BACKGROUND

The events that led to Jackson's murder conviction occurred on the evening of July 6 and early morning of July 7, 2019.  Ponce and his cousin Andres Torres were walking to Ponce's car when they had an altercation with Jackson.  Minutes later, Ponce was standing near his car waiting for Torres

1

when he was shot and killed. Surveillance video from various locations in the neighborhood where the murder occurred became crucial evidence in the police investigation, which culminated in the filing of criminal charges against Jackson.

***Charges Against Jackson***

In October 2020, Jackson was charged with committing three felonies during the July 2019 incident, as follows. Count one: murder of Ponce, with an enhancement for personal, intentional discharge of a firearm (§§ 187, subd. (a), 12022.7; 12022.53, subd. (d)). Count two: attempted robbery of Ponce, with an enhancement for personal use of a firearm (§§ 664/211, 12022.5, subd. (a)). Count three: robbery of Torres, with an enhancement for personal use of a firearm (§§ 211, 12022.5, subd. (a)).

In April 2022, the People filed a motion to amend the information in light of 2021 amendments to section 1170 that established new requirements for imposing a midterm sentence. (Stats. 2021, ch. 731, § 1.3; see *People v. Pantaleon* (2023) 89 Cal.App.5th 932, 936–937)[1] The proposed amended information modified the count three robbery charge pertaining to Torres by alleging six factors in aggravation: the crime involved great violence, bodily harm, cruelty viciousness or callousness; Jackson was armed and used a weapon; Torres was particularly vulnerable; Jackson has been convicted of other crimes justifying consecutive sentences; the manner of the crime

---

[1] The amended statute requires, among other things, that aggravating factors justifying imposition of a middle term must be supported by facts that are either stipulated to by the defendant or have been found true beyond a reasonable doubt at trial. (§ 1170, subd. (b)(2).) Absent specified exceptions, the defendant may demand that aggravating circumstances alleged against him be decided at a bifurcated trial, in which case the "jury shall not be informed of the bifurcated allegations until there has been a conviction of a felony offense." (*Ibid.*)

2

indicates planning; and Jackson engaged in violent conduct, making him a danger to society.

Trial was set for July 2022, the court heard pretrial motions in August and September, and the prosecution called its first witness on September 12. On September 21, the court granted the People's motion to amend the information to add aggravating factors that would be considered if a bifurcated proceeding became necessary.

## Prosecution Case

A "compilation" video, consisting of clips from several different surveillance cameras collected during the police investigation of Ponce's murder became the centerpiece of the People's case against Jackson. The compilation video was admitted into evidence at trial pursuant to the parties' stipulation.

### The Murder

In 2019, Jackson occasionally went to the City Nights night club on Harrison Street in San Francisco. On the evening of July 6, 2019, Jackson's BMW was parked for several hours in the vicinity of City Nights, on Tandang Sora Street between Rizal and Bonifacio Streets. From around 9:00 p.m. until midnight, Jackson spent time alternating between sitting in the BMW and walking around the neighborhood, often talking on a cell phone.

That same night, Ponce and Torres drove to San Francisco in Ponce's Scion to visit some strip clubs. Then they went to City Nights, arriving there before 10:00 p.m. and parking on Bonifacio, near Mabini and Lapu Lapu Streets. After consuming several beers and tequila shots, the cousins left City Nights, intending to return to a strip club. As they walked toward Ponce's car, they checked door handles of parked cars to see if any were

3

unlocked, looking for valuables to steal. At one point, Torres took a coin purse from an unlocked car, setting off the alarm.

When the pair reached Tandang Sora Street, they came upon Jackson's BMW. Torres testified at trial about what happened next. Ponce tried to open the driver's door of the BMW, and then backed away as Jackson jumped out of the car and pointed a semiautomatic pistol at Ponce. Ponce moved to the sidewalk with Torres, where Jackson demanded their phones and wallets and whatever property they had. The cousins responded that they did not have anything. But when Jackson asked Torres what was in his hand, Torres tossed the coin purse toward him. As Jackson retrieved the purse from the ground, Ponce and Torres backed away and retreated around the corner. This initial encounter that Jackson had with Ponce and Torres was depicted in the compilation video played for the jury at trial. The video also showed that Jackson got back in his car after he confronted the other two men.

Torres testified that after they left Jackson, he and Ponce made their way back to Ponce's car on Bonifacio Street. Torres walked to some bushes on the corner to "relieve" himself, and when he turned back toward the car, he saw Jackson running down the street toward Ponce. Jackson had a gun in his hand, and Torres had no trouble recognizing him as the same man who had robbed him of the coin purse. Torres could not hear what Jackson and Ponce said to each other, but he saw that Jackson pointed his gun at Ponce and Ponce had his hands raised as he tried to back away. This second encounter between Jackson and Ponce was also recorded on the compilation video, although the parties strongly disagreed about how properly to interpret what had occurred.

4

Torres testified that he ducked behind a car, then ran southbound on Lapu Lapu. As he ran away, Torres heard three gun shots. Torres ran because he was scared, but quickly returned to check on his cousin. Ponce was lying in front of his car, bleeding. He suffered two gunshot wounds, one in the back and the other in the chest. Expert evidence and testimony established that Ponce's cause of death was penetrating gunshot wounds, either of which could have been fatal, and the "manner of death" was homicide.

Two other people who witnessed the shooting testified at Jackson's trial. L. Gordon was working as a security guard at a construction site about 50 to 70 yards away from where Ponce was shot. At some time between 12:40 and 1:00 a.m., Gordon was in his vehicle facing Bonifacio when he saw two shadowy figures, one appearing to chase the other until they stopped in front of a parked car. Gordon got out of his vehicle and went to the construction fence to get a closer look. From there he saw the victim raise his hand as if to ward off the assailant, who took a few steps toward the victim, pulled a gun from his waist band, shot the victim twice, and then ran back down Bonifacio. Gordon called 9-1-1, and waited at the scene. Police arrived 15 or 20 minutes later.

B. Murillo lived in the neighborhood where Ponce was killed; the back side of his apartment building was adjacent to Bonifacio Street. On the morning of the shooting, at around 12:40 a.m., Murillo was outside behind his building getting some air, when he was approached by a man who said, " 'I'm not about a robbery.' " The man was between 50 and 60 years old, white with gray hair, wore dirty rumpled clothes and appeared to be homeless. Murillo followed the man's gaze and looked down Bonifacio. About 30 yards away, Murillo saw a dark-skinned man with his arm raised pointing a gun at

5

another man with lighter skin who was standing in the street. The man with the gun was wearing a dark top and pants that were a lighter color than his top.[2] Murillo then moved back behind a pillar for his own safety. He heard gunshots, hesitated for less than 30 seconds, then looked out and saw the man with the gun running away.

The jury was told about another possible witness to the shooting who did not testify, but was described by R. Thomas, a security guard for City Nights who did testify at trial. On the night Ponce was killed, Thomas was working in front of the club. At some time between 12:45 and 1:00 a.m., Thomas encountered an African American man wearing white pants. The man told Thomas that " '[s]omebody just got shot over around the corner,' " and then he lay on the ground where cars were parked as if he was recreating the scene of a person who "had been shot [lying] there." Thomas could not recall if the man said anything else, but he testified that the man was acting "weird" and seemed "odd." The man did not have a weapon, did not say anything about a robbery, and did not recount to Thomas anything else about the shooting. Thomas thought the man was under the influence of some sort of drug.

A man wearing white pants also had a brief encounter with one of the officers who assisted at the crime scene. The man approached Officer Ledesma, who told him to move back behind the crime scene tape. At trial, Ledesma could not recall what if anything the man said, but an audio/video clip of the encounter that was recorded on Ledesma's body camera was

---

[2] The Appellant's Opening Brief states that Murillo told police the shooter wore white pants. That statement is not supported by Jackson's record citations. The Respondent's Brief states that Murillo testified the man standing next to him when he first noticed the altercation on Bonifacio was wearing white pants, which is also inaccurate.

6

admitted into evidence. The clip showed an African American man in white pants trying to make contact with the officer. The sound quality was poor, and the parties disagreed at trial about whether the man was attempting to report that he witnessed the shooting, or if it was even possible to hear anything the man said.

### *Police Investigation*

Police identified Jackson as the owner of the BMW that was captured on surveillance video. Torres described his assailant as an African American male in his 20's who wore a hoodie and dreadlocks, and on August 9, 2019, he identified Jackson in a photo lineup. Jackson was arrested a month later. Officers recovered evidence from Jackson's phone showing that during the two weeks after Ponce's shooting, Jackson conducted multiple searches about shootings in San Francisco, and that he also searched for information about how location history is stored.

Jackson participated in an interview with two investigating officers after waiving his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. His recorded statement was admitted into evidence at trial. Jackson told the officers he did not typically "hang out" in San Francisco, but he recalled going to the City Nights club with his friend Amani in June or July, and that he drove there in his BMW. They arrived at the club at around 10:00 p.m., met up with their friend Isaac, and left sometime between midnight and 2:00 the next morning. Jackson acknowledged knowing that a shooting happened that night, but he said that "all that stuff" happened after he and his friends left the city. He denied seeing police or emergency personnel when he went to his car after leaving the club and said that he knew about the shooting only because somebody told him about it later.

Officers showed Jackson photographs of the BMW that was seen on surveillance video near the murder scene. He said the car looked like his, but he was not sure. Then he told a confusing story about going back to the area the following day with Amani, Isaac and Amani's cousin Nick, because they wanted to see the crime scene. Jackson recalled that it was partly cleaned up but there was still blood on the ground. As for the night of the shooting itself, Jackson did not see anything because he was in the club, and when he left with Amani they drove directly to the East Bay. Jackson said he and Amani went to the club to party, did not carry guns, and did not get into any fights.

The officers told Jackson they had evidence that he was involved in the shooting. Jackson acknowledged that the car in the photograph was his, but he denied that he was the person depicted in that photograph. One officer said there was video of an interaction that happened when two guys came up to Jackson's car. Jackson responded that nobody came up to his car, other than Amani and Nick. He denied chasing anybody or "even" running that night. The person in the photograph was not him, Jackson insisted. He, Amani and Nick went to the club together, and did not have to pay for anything because they met Isaac there and he got them in. A few hours later he left with Amani and Nick because he was their ride home. The officer told Jackson more about the video. He responded that nobody tried to break into his car, and said that he would not just sit in his car with the door unlocked. He did not "remember" any of the things the officers recounted and denied having an altercation with anybody that night. When the officers disclosed that they found multiple searches about the shooting on Jackson's phone, he said that Amani had used his phone.

Surveillance video of the entrance to City Nights did not record Jackson going into the club at any time during the period between 9:00 p.m. on July 6

8

and the time of the shooting, but Jackson was seen walking around the neighborhood during the time he claimed to be inside the club. Police never located Nick, but Isaac and Amani testified at trial. Issac was not in San Francisco on July 6 or 7, 2019, was not a close friend of Jackson, and never went to City Nights with Jackson. Issac did not tell Jackson about the shooting near that club, nor did he go to the crime scene with Jackson. Amani had been friends with Jackson since high school, but he was not with Jackson or at the City Nights on July 6 or 7, 2019. Nor did he go with Jackson to the crime scene or use Jackson's phone to do searches about the shooting.

### Defense Case

Jackson called four witnesses who testified about his good character. Amani C. did not give Jackson an alibi, but he did testify that Jackson was "a very non-violent person," and "slow to anger." Jackson's sister, who moved out of the family home when Jackson was 12 or 13, never saw Jackson get in a fight or carry a firearm, and believed him to be a "peaceful person" who never "showed any violence." Jackson's other two witnesses had known him since childhood and knew him well, as he had spent time living with each of their families. M. Vega described Jackson as "one of the more peaceful people I've ever met." T. Anderson had never seen Jackson in a fight, commit a crime, or carry a firearm.

The defense theory presented to the jury during closing argument was that the prosecution failed to overcome a presumption that Jackson was innocent of the charges. Defense counsel argued that the jury was required to find Jackson innocent of all charges because the trial evidence supported reasonable conclusions that Torres lied about being robbed, and that Ponce was shot by a man wearing white pants, not Jackson.

9

Defense counsel described Jackson as a young man, with a bright future and a reputation in the community of being peaceful and nonviolent. Counsel argued this conception of Jackson was fully consistent with the video evidence, which showed he spent three hours walking around and doing nothing wrong. Torres should not be believed, defense counsel argued, because he was not credible, he was a car burglar, and he was intoxicated on the night Ponce was killed. Moreover, the gun Jackson held when Ponce tried to get into the BMW was a not a real gun, but a BB gun that was later found in Jackson's home, counsel argued.

The defense argued further that the video evidence supported finding that a man in white pants, who was not Jackson, had killed Ponce. Counsel urged the jury to view the video carefully, as it was consistent with the following scenario: After Ponce and Torres attempted to break into the BMW, Jackson was left feeling frightened, so he went for a walk and just happened to see someone else—a man in white pants—trying to rob Ponce at gunpoint. One clip of surveillance video captured audio of someone trying to convince the assailant not to shoot Ponce, and defense counsel argued it was reasonable to conclude that voice was Jackson, who was trying to "reason with a . . . 'super crazy' guy in white pants." The video of Jackson and Ponce running down the street was evidence that they were both accosted by the man in white pants, who fired shots at them and happened to hit Ponce, while Jackson was able to veer off and run for his life down Bonifacio.

### Jury Verdicts and Jackson's Sentence

The jury began deliberating on the afternoon of September 28, 2022, and reached a verdict on October 4. They found Jackson guilty of first degree murder and found true the allegation that he personally and intentionally discharged a firearm. Jackson was found not guilty of attempted robbery of

10

Ponce, and not guilty of robbery of Torres. Jackson was sentenced on August 16, 2023. The court imposed 25 years to life in state prison for the murder conviction, exercising its discretion to strike the enhancement for personal use of a firearm. This timely appeal followed.

## DISCUSSION

### I. Jackson's Right to Confrontation

Jackson contends he was deprived of his constitutional right to confront witnesses against him because the trial court required that everyone in the courtroom wear masks due to the Covid-19 virus. " 'We review de novo a claim under the confrontation clause that involves mixed questions of law and fact. [Citation.] Under this standard, we defer to the trial court's determination of "the historical facts" . . . but not the court's "application of [the] objective, constitutionally based legal test to [those] historical facts." ' " (*People v. Bharth* (2021) 68 Cal.App.5th 801, 813.)

### A. Additional Background

During jury selection, Jackson filed a motion for an order permitting "fully vaccinated persons" to appear in court "unmasked." He objected to the San Francisco Superior Court's requirement at the time that all people appearing in court wear masks, contending the policy (1) was "arbitrary and capricious" and (2) violated his Sixth Amendment rights to a fair trial and to confront and cross-examine witnesses. Jackson maintained that it had been more than two years since the Covid-19 pandemic hit California, vaccinations for the virus were effective, and the San Francisco Superior Court was an "outlier" in its refusal to lift its mask restriction. Jackson's evidence for these assertions consisted of information gleaned from websites and online articles. Building on his predicate factual claims, Jackson argued there was no

11

substantial justification for a mask regulation that impeded his constitutional right to "face-to-face" confrontation.

The court denied Jackson's motion, basing its ruling on decisions of law that had rejected similar challenges to Covid-19 mask requirements, and the principle that "the presence of a face covering does not, per se, violate the confrontation clause." The court rejected Jackson's contention that all public health experts agreed about the then-current level of risk posed by Covid-19. The court pointed out, for example, that the Medical Director for the University of California, San Francisco advised wearing masks indoors. It also observed that some of Jackson's information had been "universally criticized," and it opined that some recommendations to lift mask restrictions were reflective of political pressure from people fatigued by the presence of the virus and mitigation measures that were still in place.

The court also explained the basis for the San Francisco Superior Court's indoor mask mandate. The mandate was adopted and maintained pursuant to three votes of all the judges in the San Francisco Superior Court, and was subject to being reassessed on September 30 of that year. Reasons for the policy included that the court did not require proof of vaccination upon entry into the courthouse, and there were "many people of all different ages and different levels of immunocompromised status as well as vaccination status." As to this last point, the court noted the vaccination rate among people within the criminal justice population was lower than the norm.

For all these reasons, the court concluded that it would enforce the superior court's standing order, still in effect at that time, that "all persons within the confines of the courtroom have to wear masks."

## B. Analysis

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) This right, guaranteed by the state and federal constitutions, " ' "seeks 'to ensure that the defendant is able to conduct a "personal examination and cross-examination of the witness." ' " ' [Citation.] Via the confrontation right, a defendant is able to compel prosecution witnesses to appear before the jury so their credibility may be assessed." (*People v. Wilson* (2021) 11 Cal.5th 259, 289–290.) This right is important "but it is not absolute." (*Id.* at p. 290.) The " 'Confrontation Clause reflects a preference for face-to-face confrontation at trial,' [citation], a preference that 'must occasionally give way to considerations of public policy and the necessities of the case. ' " (*Maryland v. Craig* (1990) 497 U.S. 836, 849 (*Craig*).)

Courts applying these principles have repeatedly held that the rights of criminal defendants under the Confrontation Clause are not violated by mask requirements necessitated by the Covid-19 pandemic, which further the public policy of ensuring the safety of everyone in the courtroom. (*People v. Molina* (2023) 96 Cal.App.5th 516, 520, 521; *People v. Edwards* (2022) 76 Cal.App.5th 523, *People v. Lopez* (2022) 75 Cal.App.5th 227, 230; *People v. Alvarez* (2022) 75 Cal.App.5th 28, 36.) We agree with these courts and adopt their reasoning in denying Jackson's confrontation claim in this case.

In finding that Jackson has failed to prove a violation of his right to confrontation, we emphasize what Jackson does not dispute—witnesses appeared in person, testified under oath, and were subject to rigorous cross-examination. Thus, Jackson did confront witnesses in a manner that afforded him procedural safeguards the Confrontation Clause is designed to

13

protect. (See *Craig*, *supra*, 497 U.S. at p. 846.) A face mask that covered the mouth and partially covered the nose of persons testifying did not prevent Jackson or the jurors from observing significant aspects of the witnesses' appearance and demeanor. " 'The Confrontation Clause does not guarantee the right to see the witness's lips move or nose sniff, any more than it requires the jurors to subject the back of a witness's neck to a magnifying glass to see if the hair raised during particularly probative questioning.' " (*People v. Alvarez*, *supra*, 75 Cal.App.5th at p. 38.)

Jackson contends that California authority rejecting Confrontation Clause challenges to Covid-19 masks is inapposite because, at the time of his trial, the pandemic was over and therefore there was "***zero*** public health justification" for a mask requirement. We are not persuaded by this argument. The trial court articulated specific factual reasons why retaining the masking requirement protected people in the courtroom, regardless of their personal health and vaccination status. The factual circumstances articulated by the court are more than sufficient to defeat Jackson's claims that the mask requirement was arbitrary and unsupported by a legitimate public health policy.

Jackson relies heavily on *Romero v. State* (Tex. Crim. App. 2005) 173 S.W.3d 502 (*Romero*). In that case, a witness who saw the defendant shoot a gun into a nightclub refused initially to testify at trial, out of fear of retaliation. (*Id*. at p. 503.) Over a defense objection, the trial court permitted the witness to testify while wearing a disguise consisting of dark sunglasses, a cap pulled down over his forehead, and a long-sleeved jacket with the collar turned up and fastened so that it obscured the witness's mouth, jaw and the lower half of his nose. (*Id*. at pp. 503–504.) Ultimately, the Texas Supreme Court found the defendant's right to confrontation had been violated, though

14

it considered the issue to be "very close," and one judge dissented. (*Id.* at p. 503.) The court reasoned the disguise itself seriously impeded the jury's ability to observe the witness's demeanor, and the reliability of the witness's testimony was not "otherwise assured" because the witness clearly believed the disguise insulated him from the defendant, thus compromising his accountability. (*Id.* at p. 505.) Moreover, protecting a witness from retaliation could be an overriding interest, the court found, but the disguise authorized by the trial court did not serve that function because the name and address of the witness were already known to the defendant prior to trial. (*Id.* at p. 506.)

Although not binding on us, *Romero* is consistent with our conclusion that Jackson's confrontation right was not violated here. The mask required for all people who appeared in the courtroom during Jackson's trial was not a disguise and did not deprive the jury of the ability to observe the witnesses' eyes, as did the cap and sunglasses in *Romero*. (*Romero, supra*, 173 S.W.3d at pp. 503, 505.) As the eyes are sometimes called windows to the soul, we do not discount this factual difference. Moreover, the public safety need to combat the highly contagious virus is a compelling interest that justified the modest infringement on the right to face-to-face confrontation. Jackson's contention below and on appeal that masks were no longer warranted is an opinion not an empirical fact, and the trial court's contrary conclusion was supported by substantial evidence.

## II. The Prosecutor Misconduct Claim

Jackson next contends that the "second-chair prosecutor" at Jackson's trial committed prejudicial misconduct. " 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.

15

Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' " (*People v. Montes* (2014) 58 Cal.4th 809, 869.) " 'We review the trial court's rulings on prosecutorial misconduct for abuse of discretion.' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1122.)

## A. Additional Background

On September 9, 2022, Jackson made an oral motion for a mistrial on the ground that Assistant District Attorney Courtney Burris had made a public post on Facebook two days earlier, which stated: "Ready to pick this jury. Let's goooo!#CourtneyBurrisForThePeople #FirstHomicideTrial #QuestForJustice." Burris posted her comment the day after jury selection began, and the defense argued that she had violated rule 3.6 of the Rules of Professional Conduct, which regulates trial publicity. Counsel argued the comment was particularly concerning because Burris's Facebook account was "not private," and she had posted another inappropriate comment several months earlier, in December 2021, which stated that she had been transferred to the homicide department and was excited to take on the new challenge of "advocating for justice for those whose lives were tragically cut short and the families left behind."

The trial court ruled that, at that "juncture" in the proceeding, there had not been an adequate showing for a mistrial, but it would "certainly reconsider" if something more came to light. The court observed that at least once during jury selection, if not every day, it had admonished the jury pool not to go on the internet to look up "the lawyers, anything . . . [the] law of homicide or anything related to the case." It was not persuaded that Burris's December 2021 post had any connection to the case, and as to the September

16

2022 comment, the defense failed to make "a sufficient showing of prejudice" to justify a mistrial. However, the court ordered Burris to remove the September post and the previous post as well, in an abundance of caution.

The court also expressly rejected a contention by Burris that she was exercising her First Amendment right, admonished her about the danger of engaging in this kind of social media activity, and made "another order that all lawyers here are prohibited from making any social media commentary about any of their activities as long [as] I'm trying this case." Neither party requested that the court raise the issue with the jury, and the court declined to do so unless there was a showing that someone had actually accessed the information. Finally, the court expressed anger about Burris's conduct, finding it was "incomprehensible . . . why anyone would take a chance on having any sort of commentary about a pending criminal case." Ultimately though, the court was convinced that "at this point any harm is speculative," although it reiterated that it would reconsider the matter if the defense made "a further showing at some point."

## B. Analysis

Jackson posits that Burris's Facebook post was "a clear case of prosecutor misconduct," and it must be deemed prejudicial because it was so egregious that it deprived Jackson of due process and a fair trial. We are not persuaded either that misconduct occurred or that it was prejudicial.

According to Jackson, "[t]here is no question that Burris committed prosecutorial misconduct by commenting about the case on social media during trial." Jackson misconstrues the comment Burris actually made, as she did not mention Jackson in her post, nor did she discuss substantive information relevant to the charges against him. She merely announced herself "[r]eady" to undertake the jury selection process that had already

17

begun. While her remark may have been immature or unprofessional, it was about herself and her enthusiasm for her work, not about Jackson or the Ponce murder.

Jackson contends that Burris's post was misconduct because it implied that only the prosecution was working toward justice, which conveyed the message that Jackson's defense team was not seeking justice. That theory imagines meanings her words did not convey. To buttress the argument, Jackson relies on the post Burris made several months before trial, which expressed excitement about being transferred to the homicide department and "advocating for justice." However, Burris's publicly expressed opinion that she would be working for justice did not state or imply anything about the goal of criminal defense counsel generally, or of Jackson's trial counsel specifically. Even when considered together, these Facebook comments are not reasonably construed as a critique of Jackson's counsel or the defense case.

Jackson relies primarily on *Gentile v. State Bar of Nevada* (1991) 501 U.S. 1030, which involved a criminal defense attorney who was disciplined for violating a State Bar rule by making remarks about his client's innocence during a pretrial press conference. The Supreme Court *reversed* the disciplinary order, finding that the petitioner's First Amendment rights were violated, and the State Bar rule was unconstitutionally vague. In reaching those conclusions, the Court affirmed the right of states to restrict attorney speech that "will have a 'substantial likelihood of materially prejudicing an adjudicative proceeding' " (*id.* at p. 1034), but it found that the *Gentile* petitioner "spoke at a time and in a manner that neither in law nor in fact created any threat of real prejudice to his client's right to a fair trial or to the State's interest in the enforcement of its criminal laws" (*id.* at p. 1033).

18

Applying those criteria here, we find no threat of real prejudice to Jackson associated with Burris's overzealous Facebook post, which had nothing to do with Jackson or the charges he faced.

We agree with Jackson that public prosecutors are held to a higher standard than other attorneys (*People v. Kelley* (1977) 75 Cal.App.3d 672, 690), but *Kelley* involved aggressive behavior and improper remarks that occurred in open court, nothing comparable to the enthusiastic social media comments that Jackson challenges here.  In the trial court, Jackson relied on a state rule of professional conduct, which provides that a lawyer participating in litigation of a matter shall not make an extrajudicial statement that the lawyer knows, or should know, will be disseminated to the public *and* will have a substantial likelihood of "materially prejudicing an adjudicative proceeding in the matter."  (Rules Prof. Conduct, rule 3.6.) Jackson does not invoke this rule on appeal, or make any showing to support a finding that Burris violated it.

Jackson posits that attorney statements exposing the jury to extrajudicial evidence could prejudice the defense and violate due process. (Citing *Sheppard v. Maxwell* (1966) 384 U.S. 333 [trial court failed to protect defendant from pervasive prejudicial publicity].)  Again though, the Facebook post did not discuss the substance of the case against Jackson or even mention him by name.  (Compare with *State v. Polk* (Mo. Ct.App. 2013) 415 S.W.3d 692, 695–696 [prosecutor's repeated use of Twitter feed to publicly comment on defendant's case during trial magnified risk jury would be tainted by undue extrajudicial influences].)  Moreover, when the matter was brought to the trial court's attention, the court issued an explicit order not to post about the case during the pendency of the trial, issued a strong admonishment to Burris, and ordered her to remove her posts.

On appeal, Jackson emphasizes repeatedly that the trial court characterized Burris's decision to post her comment as incomprehensible. Jackson overlooks that the court also found there was no evidence that potential jurors had actually seen the Facebook comment. Before the comment was posted, the court had admonished the jury pool not to look up any of the lawyers on social media. Moreover, when the court denied Jackson's mistrial motion it did so without prejudice, expressly inviting the defense to supplement their motion with a showing of harm. Yet no further filing was made.

Finally, Jackson contends that prejudice must be presumed because Burris's comment was so egregious. No, the Facebook post was not particularly egregious, and we find no authority for presuming prejudice in any event. "Even where a defendant shows prosecutorial misconduct occurred, reversal is not required unless the defendant can show he suffered prejudice." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.) Jackson fails to make that showing here, as his claim of prejudice is premised on speculation—that a juror saw the post, construed it unreasonably as evidence that the defense team was not pursuing justice, and was persuaded by the comment to convict Jackson of murder. We do not speculate. Even if making the Facebook post were somehow misconduct, it did not render the trial fundamentally unfair so as to trigger the standard of error applicable to due process violations. (*Chapman v. California* (1967) 386 U.S. 18.) Nor do we find any reasonable probability that a more favorable result would have been reached if the allegedly objectionable Facebook post was never made. (*People v. Watson* (1956) 46 Cal.2d 818.)

## III. The Jury's Improper Consideration of Aggravating Factors

Jackson contends he was denied a fair trial because the jury was exposed to extraneous information during deliberations.

### A. Additional Background

The jury began deliberation on September 28, 2022. Earlier that day, the court met with counsel to review all exhibits, verdict forms and blank jury request forms that would be sent into the deliberations room. The following week, on October 4, the jury returned their verdicts. After the verdicts were recorded, the jury was dismissed for a break, and the court disclosed to the parties that it had discovered that a document had been sent into the jury room that pertained to the aggravating factors alleged against Jackson in the amended information. Moreover, the court reported, the jury "actually considered this document and filled the document out and signed the document" even though it pertained to a portion of the trial that had been intended to be bifurcated.

To facilitate our review, we describe briefly the two-page document, which is in the appellate record. It is a court-generated document with the caption, "Special Findings: Aggravating Factors." (Boldface omitted.) The first sentence of the document states, "We the jury make the following findings regarding the alleged aggravating factors." This statement is followed by a numbered list of the six aggravating factors alleged in the amended information in connection with count three, charging Jackson with robbery of Torres. As to each factor, there are lines for the jury to indicate whether the factor is true or not true. Handwritten marks show the jury found the first, second, and sixth allegation on the list were true, thereby indicating that: the crime involved great violence, great bodily harm, threat of great bodily harm and other acts disclosing a high degree of cruelty;

21

Jackson was armed with or used a weapon during commission of the crime; and Jackson engaged in violent conduct indicating he is a serious danger to society. The jury found the third, fourth and fifth allegations were not true, thereby indicating that: Torres was not particularly vulnerable; Jackson was not convicted of other crimes for which consecutive sentences may be imposed; and the manner of the crime did not indicate planning, sophistication, or professionalism. This document was signed and dated October 4, 2022, at 12:00, which was 14 minutes after the verdicts were signed and dated.

When the trial court first advised the parties that this document had been completed by the jury, defense counsel responded it was prejudicial on its face, and stated that Jackson would be moving for a new trial. Subsequently, the jury's exposure to this document became one of three grounds upon which Jackson based his new trial motion. In July 2023, the court held a hearing at which it denied the new trial motion. Regarding the aggravating factors document, the court found that an error clearly occurred, but it was not prejudicial. The court reasoned that the jury had found half the aggravating factors were not true, and factors that were found true did not "introduce" information that was outside what the jury had already considered in the underlying trial.

## B. Analysis

As the People concede, the trial court erred by sending the aggravating factor form into the deliberation room because that aspect of the case had been bifurcated pursuant to section 1170. However, we reject Jackson's conclusory contention that the error was of constitutional dimension. Absent authority supportive of Jackson's view, we believe the error is more analogous to the erroneous admission of irrelevant evidence. The inadvertent

22

statutory violation exposed the jury to the irrelevant fact that the People had alleged that at least one of the crimes Jackson was charged with committing involved aggravating factors. This fact was irrelevant not only because the issue had been bifurcated, but also because the jury found Jackson not guilty of the count three robbery charge. The erroneous admission of evidence constitutes reversible error "if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error." (*People v. Cooper* (1991) 53 Cal.3d 771, 836.)

Jackson contends the error likely did affect the judgment because in deciding whether Jackson was guilty of murder, the jury was forced to focus on aggravating factors that were highly prejudicial to him. Jackson fails to explain why the jury would have felt forced to draw that type of connection between the murder charge and the list of alleged aggravating factors. Those factors were not addressed in the jury instructions or arguments of counsel, and Jackson points to nothing in the record indicating that the jury viewed them as relevant to its role in determining whether Jackson was guilty of Ponce's murder. Absent something contrary in the record, it is difficult to see how the form itself affected the outcome of this trial, particularly when it appears the jury completed the form after reaching verdicts on all three charges. To the extent Jackson is contending that the document itself conveyed a message that the alleged aggravating factors actually applied to Jackson, we disagree. After all, the jury found that half the factors did not apply.

Jackson argues that the record does show prejudice because the jury considered a document that pertained to the issue of penalty, punishment or disposition, which should have no impact on the trier of fact's arrival of a verdict as to guilt or punishment. (Citing *People v. Allen* (1973) 29

Cal.App.3d 932, 936.)  In *Allen*, the trial court permitted a jury to consider evidence regarding the benefits of medical and psychiatric treatment in their deliberations on the issue whether the defendant was a mentally disordered sex offender.  (*Id*. at p. 933.)  That ruling was prejudicial error the appellate court found, relying in part on "principles which prohibit comment or evidence on punishment or penalty to be considered by a jury on the issue of guilt in a criminal case."  (*Id*. at p. 938.)  *Allen* is factually inapposite and the principle it applied is not implicated here.  The document listing aggravating factors that had been alleged against Jackson was not a comment on, or evidence disclosing, the penalty or punishment Jackson could face if convicted.  And Jackson points to nothing in the record to indicate that the jury viewed the document as relevant to its consideration of issues of guilt.

## IV.  The Juror Misconduct Claim

Challenging the denial of his new trial motion on a separate ground, Jackson contends the jury committed misconduct.  "We review de novo the denial of a motion for a new trial based on jury misconduct."  (*People v. Herrera* (2024) 102 Cal.App.5th 178, 195 (*Herrera*).)  We accept the trial court's credibility determinations and findings of historical fact that are supported by substantial evidence, while the ultimate inquiry as to whether the facts constitute misconduct is a "legal question we review independently." (*People v. Collins* (2010) 49 Cal.4th 175, 242 (*Collins*).)

### A.  Additional Background

Jackson moved for a new trial on the ground that the jury committed misconduct during deliberations by manipulating video exhibits that had been admitted into evidence.  (Citing § 1181, subds. 2 & 3.)  As support for this claim, Jackson submitted a juror declaration, which disclosed that when jurors viewed "video surveillance footage," they "turned off all the lights,

24

slowed down playback using the video software, and watched the footage in slow motion." The declarant also stated that the alternate juror had a pair of headphones, and the jurors "all took turns listening" to "audio" that was "very difficult to make out." In their opposition to the new trial motion, the People argued that using a slow motion function and headphones was not misconduct, as both were proper methods of conducting a more critical examination of the trial evidence. The People emphasized that jurors did not bring in their own software program, but simply employed a feature embedded in the exhibit, citing a declaration from a second juror that Jackson had obtained but not attached to his motion.

At the hearing on his new trial motion, Jackson urged the court to hold an evidentiary hearing because the declarations showed that the jurors were tech savvy, which enabled them to enhance the video beyond what the defense had been able to do. Defense counsel opined it was even more "concerning" that jurors had used "super high-end . . . headphones" that the court had not provided to them. The People countered that the slowdown feature was part of the software that actually had been used during trial, and pointed out that one of the clips included in the compilation video was itself a slow motion video. As for using headphones, the prosecutor argued that blocking outside sound to better hear and scrutinize the evidence was not misconduct.

Before denying the new trial motion, the trial court made only a brief comment about Jackson's juror misconduct claim. Specifically, the court clarified for the record that Jackson could not use juror declarations to invade "the thought process of the jury" in order to "impeach the deliberation process or verdict."

**B. Analysis**

" 'Courts evaluate a motion for a new trial based on jury misconduct in three steps:  (1) determine what evidence is admissible; (2) if there is admissible evidence, decide if it establishes misconduct; and (3) if there is misconduct, determine whether it was prejudicial.' " (*Herrera*, *supra*, 102 Cal.App.5th at p. 195.)  On appeal, Jackson overlooks the first step of this inquiry, quoting wholesale passages from declarations that disclosed the jury's thought processes as to what issues were important and why.  The trial court correctly declined to consider such evidence.  (Evid. Code, § 1150.)  So do we.  Thus, the record shows that jurors did two things:  they slowed down portions of the video compilation; and they used headphones that were in the possession of one juror to listen to audio.  Jackson fails to show that this evidence establishes misconduct.

"Not every jury experiment constitutes misconduct.  Improper experiments are those that allow the jury to discover new evidence by delving into areas not examined during trial.  The distinction between proper and improper jury conduct turns on this difference.  The jury may weigh and evaluate the evidence it has received.  It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences.  It may reexamine the evidence in a slightly different context as long as that evaluation is within the ' "scope and purview of the evidence." ' [Citation.]  What the jury cannot do is conduct a new investigation going beyond the evidence admitted." (*Collins*, *supra*, 49 Cal.4th at p. 249.)

Applying these principles, we conclude that no misconduct occurred in connection with the jury's review of video exhibits that had been admitted into evidence and sent into the jury room.  Instead, the jury scrutinized the evidence that it received.  Slowing down the video and using headphones to

better hear the sound did not alter the evidence itself or produce new evidence. (See *Collins*, *supra*, 49 Cal.4th at pp. 252–253 [juror did not commit misconduct by using his own computer to interpret evidence and create a diagram that reflected the trial evidence].) Our conclusion is reinforced by *Herrera*, *supra*, 102 Cal.App.5th 178, a case that neither party addresses in their appellate briefs.

The *Herrera* defendant was convicted of murder, attempted robbery and other offenses based in part on surveillance video that captured the defendant's interaction with the victim. (*Herrera*, *supra*, 102 Cal.App.5th at pp. 180–181.) Following his convictions, he moved for a new trial on the ground that the jury "used a computer to 'manipulate' the surveillance videos, 'essentially creating new evidence.'" (*Id.* at p. 192.) The trial court denied the motion, and Division One of this court affirmed that ruling. (*Id.* at pp. 192, 195.) The *Herrera* court reasoned that "viewing the videos in slow motion allowed the jurors to better 'scrutinize' them (*Collins*, *supra*, 49 Cal.4th at p. 249), but it did not alter the evidence." (*Herrera*, at p. 196.) The defendant complained that the jury had viewed the videos " 'after they had been overlaid, sequenced, and looped,' " but it was not clear what the jurors actually did. (*Ibid*.) Ultimately, the defendant failed "to explain what evidence outside the record could have been created by playing the videos at different speeds or in conjunction with one another," and thus had "not demonstrated jury misconduct" the court concluded. (*Id.* at pp. 196–197.) So too here. Jackson does not show that the jury's use of a slowdown feature to more closely scrutinize the evidence created new evidence.

Using headphones raises a slightly different issue, as those were brought into the deliberation room by a juror. There is nothing unusual or surprising about the fact that a juror had headphones, which for many

Americans are as common to carry on one's person as a pen. Regardless, the dispositive fact is that using headphones only enhanced the admitted evidence, it did not create new evidence. In an analogous situation, courts have held that jurors' use of a magnifying glass does not constitute an improper experiment or the introduction of new evidence, but involves only an extension of the jury's sense of sight. (*People v. Turner* (1971) 22 Cal.App.3d 174, 182–183 [citing cases].) By parity of reasoning, using headphones to listen to audio that has been admitted into evidence involves only an extension of the jury's sense of hearing.

## V. Jackson's Forfeited Objection to Sentencing Fines and Fees

Jackson contends the trial court violated his due process rights by requiring him to pay a statutory minimum $300 restitution fine, a $30 criminal conviction assessment, and a $40 court security fee. According to Jackson, the failure to hold an ability-to-pay hearing before imposing statutory fines or fees constitutes reversible error under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

Jackson forfeited his *Dueñas* claim by failing to object to any fine or fee when they were imposed. (See *People v. McCullough* (2013) 56 Cal.4th 589, 596–597; *People v. Nelson* (2011) 51 Cal.4th 198, 227; *People v. Avila* (2009) 46 Cal.4th 680, 729.) In *Dueñas*, the misdemeanant disputed her ability to pay either a restitution fine or court fees, requested an ability-to-pay hearing, and produced evidence putting her ability to pay at issue. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1161–1163.) Here, Jackson was sentenced several years after *Dueñas* was decided, and yet he did not dispute his ability to pay a restitution fine or court fees, or request an ability-to-pay hearing.

Jackson purports to invoke "a number of theories" in arguing that his claim is preserved for review despite his failure to object below. His primary

28

argument is that the trial court's "complete failure" to exercise its discretion not to impose the challenged fees and fines requires reversal of the sentencing order, as the " '[f]ailure to exercise a discretion conferred and compelled by law constitutes a denial of a fair hearing and a deprivation of fundamental procedural rights.' " (Quoting *People v. Downey* (2000) 82 Cal.App.4th 899, 912.) However, Jackson does not point to anything in this record that even suggests the trial court failed to comprehend or exercise its discretion in this case. (See *People v. Fredrickson* (2023) 90 Cal.App.5th 984, 988 [" 'defendant must "affirmatively demonstrate that the trial court misunderstood its sentencing discretion" ' "].)

Jackson also posits that the forfeiture doctrine does not apply because his constitutional rights were violated, but he ignores binding authority establishing that sentencing-related fees and fines do not implicate the narrow category of rights that are excepted from the forfeiture rule. (*People v. Trujillo* (2015) 60 Cal.4th 850, 856; see also *People v. McCullough*, *supra*, 56 Cal.4th at p. 593.) In other arguments, Jackson misconstrues the forfeiture rule as presenting an issue of law and/or as resulting in an unauthorized sentence. Again, he fails to cite pertinent authority. Finally, Jackson argues that if the forfeiture rule applies, his trial counsel's failure to make a *Dueñas* claim constituted ineffective assistance of counsel. We reject this contention, as Jackson fails to overcome a presumption that he received effective assistance by demonstrating that his trial counsel's representation fell below an objective standard of reasonableness resulting in demonstrable prejudice. (*People v. Lucas* (1995) 12 Cal.4th 415, 436–437.)

*Dueñas* involved a misdemeanant defendant, who presented compelling evidence that she was an indigent probationer and that her inability to pay court assessments resulted in ongoing, unintended, and punitive

consequences. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160–1161, 1162.) These consequences implicated due process principles because they constituted additional punishment attributable *solely to the fact* that the defendant was indigent. (*Id.* at p. 1168.) Jackson's factual situation was different, and he does not cite record evidence supportive of his contention that his trial counsel should have made a due process objection under *Dueñas*. He intimates that the fact he was represented by court-appointed counsel establishes his inability to pay these assessments. We disagree. When considering a defendant's ability to pay a restitution fine, the court is not limited to consideration of a discrete time period and is not precluded from considering prison wages. (*People v. Douglas* (1995) 39 Cal.App.4th 1385, 1396–1397.) The ability to pay a restitution fine does not necessarily require " 'existing employment or cash on hand' " because the court may also consider the " 'defendant's ability to pay in the future,' " including his ability "to obtain prison wages and to earn money after his release from custody." (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837; see also *People v. Gentry* (1994) 28 Cal.App.4th 1374, 1376–1378; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487.) "Thus, a defendant may lack the 'ability to pay' the costs of court-appointed counsel yet have the 'ability to pay' a restitution fine." (*Douglas*, at p. 1397.)

Even if Jackson could establish his trial counsel should have made a *Dueñas*-type objection, Jackson has not demonstrated that the failure to object resulted in actual prejudice. Absent concrete evidence that Jackson is unable to pay these fines and that imposing them on him will have an unforeseen punitive consequence, we cannot find that it is reasonably probable the trial court would have stricken his restitution fine or court fees if an objection had been lodged.

30

## DISPOSITION

The judgment is affirmed.

TUCHER, P. J.

WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

*People v. Jackson* (A168657)